RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MATTHEW GILLIS (16-1245); FRED WALRAVEN (16-1249),

                         *Plaintiffs-Appellants*,

    *v.*

JOHN MILLER; in his official and individual capacities; BAY COUNTY SHERIFF'S DEPARTMENT,

                         *Defendants-Appellees*.

> Nos. 16-1245/1249

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:14-cv-12518—Thomas L. Ludington, District Judge.

Decided and Filed: January 6, 2017

Before: MOORE and CLAY, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Russell C. Babcock, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellants. Kenneth G. Galica, Daniel A. Klemptner, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellees.

    CLAY, J., delivered the opinion of the court in which HOOD, D.J., joined. MOORE, J. (pp. 16–23), delivered a separate dissenting opinion.

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

_____

**OPINION**

_____

CLAY, Circuit Judge.  Plaintiffs Matthew Gillis and Fred Walraven, former correctional officers at the Bay County Jail in Bay City, Michigan, appeal from the district court's adverse grant of summary judgment on their First Amendment retaliation claims against Defendants, the Bay County Sheriff and Sheriff's Department.  Plaintiffs allege that they were terminated from their positions at the jail in retaliation for posting a memorandum notifying their fellow correctional officers of their right to union representation during an investigation into prescription drug trafficking at the jail.  The district court concluded that Plaintiffs' memorandum was not protected speech because it did not touch on matters of public concern, and that even if it had, Plaintiffs' speech interests were outweighed by Defendants' interest in obtaining compliance from the correctional officers with their investigation.  We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.  For the reasons set forth below, we **AFFIRM** the district court's judgment.

**BACKGROUND**

**I.      Factual Background**

Plaintiffs Matthew Gillis and Fred Walraven were Correctional Facility Officers at the Bay County Jail.  Walraven was also a sergeant at the jail, and Gillis was the President of the Bay County Corrections Officers Union.  Gillis resigned his employment with the Bay County Jail on February 27, 2014, and Walraven's employment was terminated on April 15, 2014.

Defendant John Miller is the Sheriff of the Bay County Sheriff's Department, the other named defendant in this case.  The Bay County Sheriff's Department is the law enforcement agency tasked with administering the Bay County Jail.

In early 2014, an investigation began into alleged misconduct at the jail.  Sheriff Miller learned that one of his deputies had procured prescription mouthwash for an inmate.  The inmate suffered from severe halitosis and periodontal disease, and was unable to receive treatment for

the condition at the jail. The deputy's wife worked as a dental assistant and procured a prescription in her name for a periodontal mouth rinse. The deputy then picked up the prescription that had been written for his wife, scratched off her name and their home address, and placed the prescription in a jail office with specific instructions about giving the medicine to the inmate.

News quickly spread around the jail that an inmate had been given this prescription mouthwash, and several inmates began to speculate that the mouthwash contained codeine, a controlled substance. This news prompted prison management to conduct an investigation into potential prescription drug trafficking at the jail, which concluded on February 27, 2014.

During the investigation, Gillis began receiving complaints from staff regarding management's conduct during the investigation. At least five individuals complained to Gillis about management's interrogations. Two individuals reported that management threatened them and said "[i]f you don't have anything to hide, why would you need union representation[?]" (R. 29-14, Gillis Deposition, PageID #2957.)[1] The record reflects that some of the jail's staff felt intimidated by management's investigation tactics.

In response to the complaints he received from other jail staff, Gillis worked with Walraven to draft and post a memorandum informing jail staff of their rights under *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975). Walraven drafted the initial notice, and Gillis performed the final edits. The *Weingarten* memorandum is central to both Walraven's and Gillis' cases. Both plaintiffs allege that they were retaliated against by Defendants because they were involved with posting the memorandum. The memorandum was addressed to the "Bargaining Unit" from "President Matt Gillis" and stated:

> Re: Weingarten Rights
>
> Hello everyone I would like to express my gratitude in being your Union President. I feel there is a very important issue that needs to be discussed. Many deputies have been notified they need to report to a superior officer for some type of investigatory interview or investigation. When you are summoned before a

---

[1]Because many of the pertinent facts are identical in both cases, we cite primarily to the record in Plaintiff Gillis' case. Citations to the record in Plaintiff Walraven's case are noted.

superior officer, I strongly suggest you state these words before you say anything else. "If this discussion could in any way lead to me being disciplined or discharged, I request that my Union representative be present at the meeting. Without representation, I choose not to answer any questions." These rights also cover yourself in the event someone else may be disciplined due to your statement. I am in no way advising you not to cooperate with management, just advising you of your rights.

It is your responsibility to ask for the representation. It is not the responsibility of management to advise you of this. Attached are the actual Weingarten Rights. Please review them as they are extremely important for yourself and everyone else. Even if you don't think you need representation, it has been proven it is better to have another set of ears as sometimes words are taken out of context.

In conclusion you have the right to discuss union matters with your Union President and Vice President. Some of you may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others. Again, thank you for your time and I look forward to working with everyone.

Respectfully,

Matt Gillis (POLC LOCAL)

(R. 29-15, *Weingarten* Memorandum, PageID #3106 (emphasis in original).) Sheriff Miller summoned Gillis to the Undersheriff's office on February 13, 2014, the day after Gillis posted the *Weingarten* memorandum. Sheriff Miller threw the notice across the table, asked who wrote it, and declared to Gillis that "I will have you know I can have you prosecuted for interfering with an ongoing investigation for posting this memo." (R. 29-14 PageID #2960.)

The investigation into Walraven began after an anonymous note, known in the jail as a "kite" was slipped under the Undersheriff's door in January 2014. The note suggested that the jail administrators review certain security camera footage from the evening shifts, when Walraven was the supervisor. The footage revealed that the corrections officers "engaged in numerous unacceptable activities, including cell phones in the jail, playing cards for extended periods of time, damaging jail property, conducting outside business when in the jail[,] not monitoring video security cameras as necessary[,] and various other violations of department policy." (R. 25-14, Cunningham Affidavit, PageID #2286.)

Walraven was placed on administrative leave on February 18, 2014. Walraven was told that he was being placed on leave because of "an investigation of allegations of misconduct by you." (R. 29-16, Walraven Record, Administrative Leave Letter, PageID #3107.) Walraven's employment was terminated on April 15, 2014.

An investigation into Gillis began on February 26, 2014. A former inmate at the Bay County Jail alleged that Gillis engaged in a sexual relationship with her during her time in custody and after her release but while under court supervision. Gillis initially denied involvement with the individual, but ultimately admitted involvement and resigned as a corrections officer. Gillis alleges that he was constructively discharged on February 27, 2014, one and a half weeks after he posted the *Weingarten* memorandum.

## II.     Procedural History

Both Plaintiffs brought suit against Defendants in the United States District Court for the Eastern District of Michigan. Plaintiffs assert claims under 42 U.S.C. § 1983, and argue that they were discharged in retaliation for posting the *Weingarten* memorandum in violation of the First Amendment. The district court granted Defendants summary judgment in both suits, concluding that Plaintiffs' *Weingarten* memorandum was not protected speech because it did not touch on a matter of public concern, and that even if the memorandum had addressed matters of public concern, Defendants' investigatory interests outweighed Plaintiffs' speech interests. *Gillis v. Miller*, No. 14-cv-12518, 2016 WL 337454 (E.D. Mich. Jan. 28, 2016); *Walraven v. Miller*, No. 14-cv-12517, 2016 WL 337445 (E.D. Mich. Jan. 28, 2016). Both Plaintiffs filed timely appeals.

## DISCUSSION

In order to state a claim for First Amendment retaliation, a plaintiff must establish that:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)); *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001).

Here, the district court concluded that Plaintiffs failed to establish that their speech was constitutionally protected because: (i) it did not touch on matters of public concern; and (ii) even if it had touched on such matters, Plaintiffs could not prevail under the *Pickering* balancing test, which weighs any First Amendment interests possessed by the plaintiff against a public employer's interest in efficiently managing a public agency. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Plaintiffs challenge both of these determinations on appeal. We agree with the district court that Plaintiffs' claims fail under the *Pickering* balancing test, and we therefore do not reach a conclusion as to whether the *Weingarten* memorandum touched on matters of public concern.

## I. *Pickering* Balancing Test

### A. Standard of Review

We review *de novo* the district court's grant of summary judgment. *Perry v. McGinnis*, 209 F.3d 597, 600 (6th Cir. 2000). A movant is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion, the reviewing court must construe the facts in the light most favorable to the non-movant. *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). "Where there are no disputed, material facts, we determine, *de novo*, whether the district court properly applied the substantive law." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004).

"Application of the *Pickering* balancing test is a matter of law for the court to decide." *Id.* at 593. Our review of the district court's *Pickering* analysis is accordingly *de novo*. *Murphy v. Cockrell*, 505 F.3d 446, 452–53 (6th Cir. 2007).

**B.     Analysis**

In order to determine whether Plaintiffs' speech is protected by the First Amendment, we must apply the test the Supreme Court developed in *Pickering v. Board of Education*. The *Pickering* balancing test is used "to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Scarbrough*, 470 F.3d at 255. When conducting a *Pickering* analysis, we must weigh "the employee's interest in 'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering*, 391 U.S. at 568).

"In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The Supreme Court has "previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*

We have long recognized "the importance of deference" to law enforcement officials when speech threatens to undermine the functions of organizations charged with maintaining public safety. *See, e.g.*, *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989); *Cherry v. Pickell*, 188 F. App'x 465, 469–70 (6th Cir. 2006) ("[I]n the context of police departments, we have emphasized that the court should show 'deference to the city's judgment on the matter of discouraging public dissension within its safety forces.'" (citation omitted)); *cf. Kelley v. Johnson*, 425 U.S. 238, 247–48 (1976) (holding that policies regulating the uniforms and conduct of police officers are entitled to great deference, and should not be set aside unless individual officers "can demonstrate that there is no rational connection between the regulation, based as it is on the county's method of organizing its police force, and the promotion of safety of persons and property"). Thus, although it is not "the rule of this Circuit[] that public safety employers have a greater weight placed on their interests in order and discipline than other

employers have in their institutional interests," *Mosholder v. Barnhardt*, 679 F.3d 443, 451 (6th Cir. 2012), we have nevertheless recognized that law enforcement officials often have legitimate and powerful interests in regulating speech by their employees. As we observed in *Brown*:

> "[W]here an officer's speech-related activity has the effect of materially disrupting his working environment, such activity is not immunized by constitutional guarantees of freedom of speech." [*Hughes v. Whitmer*, 714 F.2d 1407, 1422 (8th Cir. 1983).] . . . [Law enforcement officials are] not required to "tolerate an action which [they] reasonably believe[] would disrupt the office, undermine [their] authority, and destroy close working relationships," [*Connick v. Myers*, 461 U.S. 138, 154 (1983)], and "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." [*Id.* at 153.]

*Brown*, 867 F.2d at 322–23.

Here, Plaintiffs argue that Defendants were required to submit evidence that the *Weingarten* memorandum caused actual disruption to the jail's operations, and because Defendants failed to submit such evidence, Plaintiffs must prevail under the *Pickering* test. In support of this argument, Plaintiffs cite our decision in *Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012). But *Whitney* did not purport to hold, as Plaintiffs argue, "that showings of prior disruptions in the workplace are required" before public employers may regulate employee speech. (Walraven Opening Br. at 26.) Rather, *Whitney* held that "*speculative* concerns of workplace disharmony are insufficient to overcome [an employee's] interest in speaking as a private citizen on a matter of public concern." *Whitney*, 677 F.3d at 298 (emphasis added).[2]

In fact, it appears that we have never squarely addressed whether employers must show evidence of actual disruption in order to prevail under the *Pickering* test. Our sister circuits appear to be split on this issue. The Second, Third, Seventh, Eighth, Ninth, and Eleventh Circuits have each held that evidence of actual disruption is not required. *See, e.g., Munroe v.*

---

[2]Not all employer concerns regarding the potential of employee speech to cause workplace disharmony are necessarily speculative merely because actual disruption has not yet resulted. Whether such concerns are speculative will vary depending on the context in which the employee speech arose. For instance, if a public employee levels wholly unfounded accusations in the press that his colleagues are corrupt, it would not be "speculative" for the employer to worry about workplace disharmony.

*Cent. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015) ("The government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech."); *Lewis v. Cohen*, 165 F.3d 154, 163 (2d Cir. 1999) ("The State need show only a '*likely* interference' with its operations, and 'not an *actual* disruption.'" (citations omitted); *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 979 (9th Cir. 1998) ("[P]ublic employers need not allege that an employee's expression actually disrupted the workplace; 'reasonable predictions of disruption' are sufficient." (citation omitted)); *Shahar v. Bowers*, 114 F.3d 1097, 1108 (11th Cir. 1997) (en banc) (holding that "a particularized showing of interference with the provision of public services is not required" under *Pickering*); *Wallace v. Benware*, 67 F.3d 655, 661 n.8 (7th Cir. 1995) ("We do not agree, however, that an actual disruption of the affected department need be shown . . . ."); *Tindle v. Caudell*, 56 F.3d 966, 972 (8th Cir. 1995) ("A showing of actual disruption is not always required in the balancing process under *Pickering*."); *see also Foster v. City of Southfield*, 106 F.3d 400, 1996 WL 742291, at *3 (6th Cir. Dec. 20, 1996) (unpublished table disposition) (A "government employer need not prove actual disruption, but rather merely the likelihood of disruption."). By contrast, the Tenth Circuit has held that under the *Pickering* test, the "government must produce evidence of an actual disruption of services which results from the employee's speech." *See, e.g.*, *Schalk v. Gallemore*, 906 F.2d 491, 496 (10th Cir. 1990).

The circuits holding that employers are not necessarily required to show an actual disruption stemming from employee speech have generally followed the analysis provided by a plurality of the Supreme Court in *Waters v. Churchill*, 511 U.S. 661, 673–74 (1994) (lead opinion of O'Connor, J.). There, four Justices explained that the Supreme Court has:

> . . . consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative. One could make a respectable argument that political activity by government employees is generally not harmful, see *Public Workers v. Mitchell, supra,* 330 U.S. at 99, 67 S. Ct., at 569, or that high officials should allow more public dissent by their subordinates, *see Connick, supra,* 461 U.S., at 168–169, 103 S. Ct., at 1701–1702 (Brennan, J., dissenting); Whistleblower Protection Act of 1989, 103 Stat. 16, or that even in a government workplace the free market of ideas is superior to a command

> economy. **But we have given substantial weight to government employers' reasonable predictions of disruption**, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential.

*Id.* (emphasis added).

However, the Tenth Circuit appears to follow the rule set forth in *Melton v. City of Oklahoma City*, 879 F.2d 706, 715–16 (10th Cir. 1989). There, the Tenth Circuit held "that the government must introduce evidence of an actual disruption of its services resulting from the speech at issue" in order to prevail under the *Pickering* test. *Id.* In support of this conclusion, the Tenth Circuit cited *Rankin* and *Pickering*, as well as cases from the Third, Seventh, Ninth, and District of Columbia Circuits. *See id.* at 716 & n.11.[3] Additionally, the Tenth Circuit argued that it was "not creating a new rule nor . . . increasing the quantum of proof which the government must carry. We merely recognize what we believe to be an obvious *Pickering* requirement that the government show *some* ascertainable damage to its functioning as a result of the challenged speech." *Id.* at 716 n.11.

With due respect to the Tenth Circuit, we do not believe that its "actual disruption" requirement is an "obvious" application of *Pickering* and its progeny. Neither *Rankin* nor *Pickering* explicitly hold that the government must show actual disruption. It is true that in *Rankin* and *Pickering*, "the Court, while holding in favor of the employees, noted the respective employers' failure to present any evidence of office disruption." *Id.* at 739 (Baldock, J., dissenting in part); *see Rankin*, 483 U.S. at 388; *Pickering*, 391 U.S. at 570–71. But as Judge Baldock persuasively argued in his dissent in *Melton*, "these passing references to the employers' lack of evidence [are] a far cry from the judicial affirmation" of an actual disruption requirement. *Melton*, 879 F.2d at 739. Moreover, regarding the remaining cases cited by the *Melton* court, the Third, Seventh, and Ninth Circuits have subsequently clarified that government employers need not always show actual disruption in order to prevail under *Pickering*. *See Munroe*, 805 F.3d at 472; *Brewster*, 149 F.3d at 979; *Wallace*, 67 F.3d at 661 n.8. And in *American Postal Workers*

---

[3]Specifically, these cases were *Roth v. Veteran's Administration,* 856 F.2d 1401, 1407 (9th Cir. 1988), *Conner v. Reinhard,* 847 F.2d 384, 390 (7th Cir. 1988), *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir. 1988), and *American Postal Workers Union v. Postal Service,* 830 F.2d 294, 303 n. 12 (D.C. Cir. 1987).

*Union v. Postal Service*, the D.C. Circuit explicitly recognized that "there are cases where the harmful nature of speech is so apparent that no evidentiary inquiry need be made into actual disruption of the employer's 'responsibilities to the public[.]'" 830 F.2d at 303 n.12 (citation and internal quotation marks omitted).

Rather, like the majority of our sister circuits, we "do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833–34 (8th Cir. 2015) (quoting *Hemminghaus v. Missouri*, 756 F.3d 1100, 1112 (8th Cir. 2014)); *see also Whitney*, 677 F.3d at 298 (A "government employer may take steps to ensure workplace harmony and need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action[.]'" (quoting *Connick*, 461 U.S. at 152)). We therefore join those courts and the *Waters* plurality and hold that a public employer need not show actual disruption of the public agency in all cases in order to prevail under the *Pickering* balancing test. Instead, when the employer does not offer such evidence, we must assess whether the employer could reasonably predict that the employee speech would cause disruption, *Waters*, 511 U.S. at 673–74, in light of "the manner, time and place" the speech was uttered, as well as "the context in which the dispute arose." *Rankin*, 483 U.S. at 389.

Applying this standard, we think it clear that Defendants could reasonably have predicted that the *Weingarten* memorandum might disrupt legitimate law enforcement interests in the jail. The memorandum expressly counseled the correctional officers not to speak with management without first having a union representative present. The memorandum went so far as to provide a script for correctional officers to use in case they were questioned by management. Defendants could have legitimately predicted that this advice would hinder their ability to conduct a timely and efficient investigation, and halt the flow of illegal contraband into the prison. "Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence" in prisons and such contraband poses "serious security dangers" to jail personnel and the inmates themselves. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Where, as here, jail officials have legitimate reasons to suspect that correctional officers are facilitating the acquisition of illegal contraband by

inmates, it is imperative that they take immediate steps to stop this behavior. Their failure to do so could cause harm or loss of life to the numerous staff and inmates under their charge. In this context, jail officials have a compelling interest in preventing their employees from advising other employees to delay or obstruct the investigation. *Cf. Garraghty v. Jordan*, 830 F.2d 1295, 1302 (4th Cir. 1987) (noting that "[r]ealities of the work place, especially in the paramilitary environment of corrections departments, require that authority be respected and that discipline be swift."). This interest is sufficient to outweigh any freedom of speech interests Plaintiffs may have had in posting the *Weingarten* memorandum.

Moreover, the memorandum also expressly encouraged all guards to violate their superiors' orders and disclose to Plaintiffs the substance of interviews with jail officials. It is patently obvious that speech urging public employees to disobey their superiors carries a serious risk of undermining the functioning of public agencies, and we have previously observed that law enforcement officials are "not required 'to tolerate an action which [they] reasonably believe[] would disrupt the office, [or] undermine [their] authority.'" *Brown*, 867 F.2d at 322–23 (quoting *Connick*, 461 U.S. at 154). Furthermore, Defendants had a powerful need to maintain confidentiality during their investigation. Defendants were investigating whether prison guards committed serious criminal violations. Confidentiality was necessary to insure that guards could speak freely about their co-workers' conduct without being pressured into covering for their co-workers. Confidentiality was also necessary to allow prison officials to compare what was said by each officer without the risk that the officers would coordinate and settle upon a common story. In light of Defendants' interests in seeing that their orders were obeyed, and maintaining a confidential investigation, the district court was correct that any First Amendment interests Plaintiffs may have had in posting the memorandum were outweighed by Defendants' more compelling interests.

The cases Plaintiffs cite in support of their arguments are distinguishable, and do not change our analysis here. *Whitney* involved a prior restraint, where the defendant ordered the plaintiff not to communicate with a disgruntled former employee before the plaintiff had uttered any speech that could even arguably disrupt the public agency. 677 F.3d at 295. The employer's claims that such speech would disrupt the agency were *necessarily* speculative, because the

employer did not even know the content of the speech before issuing a broad gag order, and could not reasonably predict that out-of-office communications between the plaintiff and the ex-employee would spill over into the workplace. By contrast, Defendants here were faced with actual speech urging employees to disregard their orders. And in *Solomon v. Royal Oak Township*, the plaintiff police officer was fired "for informing a newspaper reporter about departmental corruption." 842 F.2d 862, 863 (6th Cir. 1988). We have previously observed "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law . . . ." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986). Here, by contrast, the *Weingarten* memorandum did not purport to expose or comment upon any public corruption, regardless of whatever Plaintiffs might have privately believed.

Finally, we note that declining to revive Plaintiffs' First Amendment claims here will not strike a blow to the ability of union officials to communicate with union members about important labor rights. If Plaintiffs' *Weingarten* memorandum had merely restricted itself to apprising the guards of their rights, Plaintiffs likely could have stated a viable retaliation claim sufficient to survive summary judgment at this stage of the proceedings. But Plaintiffs' memorandum went farther than that, encouraging the guards not to cooperate with the investigation, and to ignore their superiors' confidentiality orders. Because the memorandum thus posed a serious threat to the integrity and efficacy of Defendants' investigation, we cannot conclude that the First Amendment shields Plaintiffs' conduct.

## II.     Matter of Public Concern

### A.     Standard of Review

Whether a public employee's speech touches on a matter of public of concern is a question of law that we review *de novo*. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995); *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 411 (6th Cir. 1994); *see also Rankin*, 483 U.S. at 385–86 & n.9. Here, the parties do not dispute the content of Plaintiffs' speech—all agree that the contested speech was the language contained in the *Weingarten* memorandum. Accordingly, our task is to determine, *de novo*, whether this speech touched on matters of public concern in light of the context in which it arose. *Farhat*, 370 F.3d at 588.

**B.** **Analysis**

A public employee's speech is only protected by the First Amendment to the extent that it "touche[s] on matters of public concern." *Leary*, 228 F.3d at 737 (citing *Connick*, 461 U.S. at 146).

> Matters of public concern include speech that "relat[es] to any matter of political, social, or other concern to the community." [*Connick,* 461 U.S. at 146.] In other words, we must determine whether the relevant speech "involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 898 (6th Cir. 2001) (quoting *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir. 1983)). Thus, speech falling into this category includes informing the public that a governmental entity failed to "discharg[e] its governmental responsibilities" or "bring[ing] to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein]." [*Connick,* 461 U.S. at 148.]

*Rodgers v. Banks*, 344 F.3d 587, 596–97 (6th Cir. 2003) (second and third alterations in original). "Additionally, in distinguishing between matters of public and private concern, we focus not on 'what might incidentally be conveyed by the fact that the employee spoke in a certain way, [but] the *point* of the speech in question.'" *Id.* (quoting *Dambrot,* 55 F.3d at 1187 (alteration in original)). "Controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Dambrot*, 55 F.3d at 1187. "However, the employee's entire speech does not have to focus on matters of public concern, as long as some portion of the speech does so." *Rodgers*, 344 F.3d at 597.

"Thus, in analyzing whether an employee's speech touches upon a matter of public concern . . . we will consider (1) the point or focus of the speech in question and (2) whether the point 'relat[es] to any matter of political, social, or other concern to the community.'" *Id.* at 600 (quoting *Connick*, 461 U.S. at 146). "In this circuit, there is not a per se rule regarding union-related speech by a public employee. It may or may not address a matter of public concern," depending on the facts of the case. *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (citing *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985)).

Here, Plaintiffs argue that the *Weingarten* memorandum touched on matters of public concern because it was aimed at: (i) exposing alleged corruption by Defendants; and (ii) insuring

that Defendants did not violate correctional officers' *Weingarten* rights during the investigation into prescription drug trafficking at the prison. As to the first argument, Plaintiffs specifically allege that Defendants were covering up the prescription drug trafficking at the jail by not including their investigative findings in a police report, and by not referring the investigation to the Michigan State Police. Plaintiffs further argue that the *Weingarten* memorandum was aimed at exposing these allegedly improper practices.

The district court found that the actual text of the *Weingarten* memorandum—the speech at issue here—did not address matters of public concern. The district court argued that because our inquiry focuses on what Plaintiffs said, rather than why they said it, we cannot credit Plaintiffs' purported concerns about corruption at the jail because those concerns did not make it into the text of the memorandum. *See Farhat*, 370 F.3d at 591 (The "pertinent question is not *why* the employee spoke, but *what* he said[.]").

Because we conclude that Plaintiffs' claims fail under the *Pickering* balancing test, we need not decide whether the *Weingarten* memorandum touched on matters of public concern. We do note, however, that this is a close issue with credible arguments on both sides, and we reiterate that whether union-related speech touches on matters of public concern is a fact-specific inquiry that varies from case to case. *See Boulton*, 795 F.3d at 534.

**CONCLUSION**

For the foregoing reasons, we hold that the district court did not err in granting summary judgment to Defendants on Plaintiffs' First Amendment retaliation claims. Accordingly, we **AFFIRM** the district court's judgment.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. Plaintiffs Matthew Gillis and Fred Walraven were Correctional Facility Officers at the Bay County Jail in Bay City, Michigan. Gillis was also president of the corrections officers' union. During a brief investigation into various allegations of misconduct at the jail, Gillis and Walraven posted a notice for other corrections officers advising them of their rights to union representation during the investigation. Shortly after Sheriff John Miller learned of the posted notice, Walraven was fired and Gillis resigned. Sheriff Miller argues that Gillis and Walraven violated department policy and were reprimanded and terminated accordingly. Gillis and Walraven disagree, arguing that their discipline and termination were the result of retaliation for their exercise of speech protected by the First Amendment to the United States Constitution. The district court concluded that Walraven and Gillis did not have a cognizable First Amendment retaliation claim and granted the defendants' motion for summary judgment. The majority's opinion, which upholds the adverse grant of summary judgment, has the ultimate effect of eroding the bedrock guarantees of the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), and relies too heavily on the speculative assessments of government employers in endorsing restrictions on public employees' speech. I respectfully dissent.

**I.**

**A.**

We review de novo a district court's decision to grant a motion for summary judgment. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016). We uphold a district court's grant of summary judgment "only where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Id. See* Fed. R. Civ. P. 56(a). We have defined a dispute of material fact as genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Ford v. Gen. Motors Corp.*,

305 F.3d 545, 551 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered." *Kalamazoo Acquisitions, L.C.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). As we have noted, "at the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Jackson*, 814 F.3d at 775 (quoting *Anderson*, 477 U.S. at 249); *see also Arban v. W. Publ'g Corp.* 345 F.3d 390, 400 (6th Cir. 2003) ("This court does not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury.").

In *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), the Supreme Court held that an employee covered under the National Labor Relations Act ("NLRA") has a right to union representation during investigatory interviews if the employee reasonably believes that the interview could result in the employer taking disciplinary action. *Weingarten*, 420 U.S. at 252–53. The majority does not dispute that Gillis's and Walraven's posting in this case constituted a notice under *Weingarten*.[1]

During an investigation into suspected misconduct at the Bay County Jail, Deputy Matthew Gillis, then president of the corrections officers' union, began receiving complaints from staff regarding the investigation. R 29-14 (Gillis Dep. at 15) (Page ID #2956). At least five individuals complained to Gillis about the interrogations by Sergeant Shore. *Id.* Two officers, Jeff Vaness and Wendy Booth, claimed that they asked Shore about whether they needed union representation during Shore's investigatory questioning. R. 29-14 (Gillis Dep. at 14) (Page ID #2057). Shore is said to have responded by saying, "[i]f you don't have anything to hide, why would you need union representation." *Id.* The officers explained to Gillis that they "were scared" and "didn't know what was going on." *Id.* According to Gillis, "I didn't know

---

[1]The majority opinion refers to the notice as the "*Weingarten* memorandum" seventeen times.

how to handle this, because everybody was asking me about union representation. And we came up with an idea to post the *Weingarten* rights, which is your rights to union representation." *Id.* at Page ID #2058. The record paints a picture of a chaotic investigation with some of the jail's staff feeling scared or intimidated. *Id.*

In response to the complaints he received from other jail staff, Deputy Gillis worked with Sergeant Walraven to draft and post a memorandum informing jail staff of their rights under *Weingarten.* Walraven drafted the initial notice, and Gillis performed the final edits. R. 29-14 (Gillis Dep. at 17) (Page ID #2958). The notice was addressed to the "Bargaining Unit" from "President Matt Gillis" and stated:

> **Re: Weingarten Rights**
>
> Hello everyone I would like to express my gratitude in being your Union President. I feel there is a very important issue that needs to be discussed. Many deputies have been notified they need to report to a superior officer for some type of investigatory interview or investigation. When you are summoned before a superior officer, I strongly suggest you state these words before you say anything else. "If this discussion could in any way lead to me being disciplined or discharged, I request that my Union representative be present at the meeting. Without representation, I choose not to answer any questions." These rights also cover yourself in the event someone else may be disciplined due to your statement. **I am in no way advising you not to cooperate with management, just advising you of your rights**.
>
> It is your responsibility to ask for the representation. It is not the responsibility of management to advise you of this. Attached are the actual Weingarten Rights. Please review them as they are extremely important for yourself and everyone else. Even if you don't think you need representation, it has been proven it is better to have another set of ears as sometimes words are taken out of context.
>
> In conclusion you have the right to discuss union matters with your Union President and Vice President. Some of you may have been ordered not to discuss what was said in a meeting with your superiors. I strongly recommend you advise us of what happened for your protection and others. Again, thank you for your time and I look forward to working with everyone.
>
> Respectfully,
>
> Matt Gillis (POLC LOCAL)

R. 29-15 (*Weingarten* Memo) (Page ID #3106). Sheriff Miller summoned Deputy Gillis to the Undersheriff's office on February 13, 2014, the day after Gillis posted the *Weingarten* notice. R.

29-14 (Gillis Dep. at 18) (Page ID #2959). Sheriff Miller threw the notice across the table, asked who wrote it, and declared to Gillis that "I will have you know I can have you prosecuted for interfering with an ongoing investigation for posting this memo." R. 29-14 (Gillis Dep. at 19) (Page ID #2960). I find the behavior of both Shore and Miller deeply concerning—an issue about which the majority is completely silent.

The majority is, however, concerned about safety at the jail, and emphasizes its concern that the *Weingarten* memorandum could "hinder [the jail's] ability to conduct a timely and efficient investigation, and halt the flow of illegal contraband into the prison." Maj. Op. at 11. I agree with the majority that the safety of inmates and jail officers is of serious concern, and I understand that jail officials must be permitted to investigate allegations of misconduct. However, the Supreme Court contemplated that workplace investigations could be slowed when it held in *Weingarten* that an employee could request a union representative at his investigatory questioning. Indeed, in *Miranda v. Arizona*, the Supreme Court endorsed pauses in criminal investigations, requiring that officers read aloud the constitutional rights of the accused. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

Gillis and others who were subjected to Shore's and Miller's threatening and intimidating behavior had a reasonable basis for believing that they could be subject to discipline—or worse—and they were therefore entitled to *Weingarten*'s protections. The majority's decision today sends the troubling signal that *Weingarten* will now apply with diminished force within the confines of a jail's four walls.

**B.**

Section 1983 of Title 42 of the United States Code provides a civil cause of action for persons "who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem*, 378 F.3d 566, 576 (6th Cir. 2004). The First Amendment to the United States Constitution provides for a right to freedom of expression and speech. U.S. Const. amend. I.

Matthew Gillis and Fred Walraven, as officers at the Bay County Jail, were public employees. For a public employee to establish a prima facie case for a claim for First Amendment retaliation, we have held that he must demonstrate:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). *See also Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). In analyzing the first element of a plaintiff's First Amendment retaliation prima facie case, "the court must first discern whether the speech is protected." *Dye*, 702 F.2d at 295. Speech of government employees is deemed protected where it "touche[s] on matters of public concern." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *Pucci v. Nineteenth Dist. Ct.*, 596 F. App'x 460, 468 (6th Cir. 2015). The Supreme Court has held that speech touches on matters of public concern when it is "speech 'relating to any matter of political, social, or other concern to the community.'" *Dye*, 702 F.3d at 295 (quoting *Connick*, 461 U.S. at 146).

When a public employee's speech does relate to a matter of public concern, our analysis of the first element of the prima facie First Amendment retaliation case turns to the balancing test developed in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Cockrel*, 270 F.3d at 1055. The *Pickering* balancing test is used "to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Scarbrough*, 470 F.3d at 255. When conducting a *Pickering* analysis, a court must weigh "the employee's interest in 'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary*, 228 F.3d at 737 (quoting *Pickering*, 391 U.S. at 568). Accordingly, "a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Pucci*, 596 F. App'x at 470 (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)).

In applying *Pickering*, we consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dye*, 702 F.3d at 295 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). "Application of the *Pickering* balancing test is a matter of law for the court to decide." *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). If a plaintiff successfully establishes his prima facie case of First Amendment retaliation, the burden of persuasion shifts to the defendants, who must, by a preponderance of the evidence, show that they "would have taken the same action even in the absence of the protected conduct." *Leary*, 228 F.3d at 737 (citation omitted).

The district court concluded that "Walraven's [and in Gillis's case, Gillis's] posting of the notice was not speech touching on matters of public concern." *Walraven v. Miller*, 2016 WL 337445, at *8; *Gillis v. Miller*, 2016 WL 337454, at *8. The majority here does "not decide whether the *Weingarten* memorandum touched on matters of public concern" because it concludes that Plaintiffs' claims fail under the *Pickering* test. I would conclude that Gillis's and Walraven's speech does touch upon a matter of public concern. Specifically, Walraven and Gillis sought to inform their fellow corrections officers about union-representation rights under *Weingarten* in a disciplinary and potentially criminal investigation, and their doing so touches squarely upon matters of public concern. Because the majority does not resolve this issue and instead determines that the Plaintiffs' claims fail under the *Pickering* balancing test, I too will focus my analysis on *Pickering*.

## C.

The majority holds that the Bay County Jail could have reasonably predicted that Gillis's and Walraven's speech would have disrupted the work environment at the jail and that regardless of whether their speech touched upon a matter of public concern, their interest in speaking was outweighed by the jail's interest in efficiently and effectively serving the community. *See* Maj. Op. at 11 ("[W]e think it clear that Defendants could reasonably have predicted that the *Weingarten* memorandum might disrupt legitimate law enforcement interests in the jail."). I would conclude that reasonable jurors could disagree about the potential effect of Gillis's and

Walraven's speech on the Bay County Jail. Although the majority draws attention to the second to last sentence of the *Weingarten* notice, which recommends officers advise their union representative of the contents of any investigatory discussions, it gives short shrift to the notice's bolded sentence which concludes the last paragraph. There, Gillis and Walraven explicitly state that "**I am in no way advising you not to cooperate with management, just advising you of your rights**." R. 29-15 (*Weingarten* Memo) (Page ID #3106). In viewing those two statements in the *Weingarten* notice, we are required to view the facts in the light most favorable to the non-moving party, and to draw all reasonable inferences in their favor. The notice recommends that officers share the contents of their investigatory discussions with their union representative even if those officers had been ordered to keep those conversations confidential. But also the notice clearly, explicitly, and emphatically says that it is not advising refusal to cooperate with the investigation but rather is advising employees of their rights. When viewing these facts in the light most favorable to Gillis and Walraven, I would conclude that the *Pickering* balancing test favors the Plaintiffs, because their important interest in speaking about their colleagues' union rights during a potentially criminal investigation is not outweighed by the jail's interest in operational efficiency.

The record is clear that Shore's investigation had already caused confusion and disruption at the Bay County Jail. To the extent that the *Weingarten* notice could have caused a disruption by encouraging officers to divulge the content of their confidential investigatory conversations to a union representative, such a disruption was occurring before the notice was posted. However, the *Weingarten* notice had the real potential to calm the fears of concerned officers and it actually informed the jail's employees of their rights under the NLRA during this potentially disciplinary and/or criminal investigation. Because the reasonably predicted effect of the *Weingarten* notice is open to conflicting interpretations and inferences, I am unable to conclude as a matter of law that the jail's legitimate and important interest in health, safety, and efficiency outweighs Gillis's and Walraven's interests in speaking out about their fellow officers' rights to union representation during a potentially disciplinary and criminal investigation.

**II.**

The majority concludes that Gillis and Walraven do not have a cognizable First Amendment retaliation claim, and that they therefore cannot establish the first prong of a § 1983 action—that they were deprived of a right secured by the Constitution or laws of the United States. The majority does not resolve the question of whether Gillis's and Walraven's speech touched upon a matter of public concern, and instead concludes that even if their speech was protected under the First Amendment, their interest in their speech was outweighed by the jail's interest in operating efficiently, thus precluding Gillis and Walraven from establishing a prima facie case for First Amendment retaliation. I believe that Gillis's and Walraven's speech does touch upon a matter of public concern, and that they should prevail under the *Pickering* balancing test. I would therefore reverse the district court's judgment, and remand for further proceedings.