NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0489n.06

No. 16-2517

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 23, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| THE ESTATE OF JEFFREY LYNN FILEK, deceased, by the Personal Representative, JEFFREY D. FILEK, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | ) ) ) | |
| Defendant-Appellee. | ) | |

BEFORE:    SUHRHEINRICH, GILMAN, and McKEAGUE, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

Jeffrey Filek, a truck driver, died of a pulmonary embolism while sitting in his cab at a Missouri truck stop. At the time of his death, Filek was insured for bodily injuries relating to his job by Defendant National Union Fire Insurance. Defendant denied coverage to Filek's Estate for its claim, concluding that Filek's pulmonary embolism was not a covered bodily injury. The district court agreed and granted summary judgment to Defendant. We affirm.

**I.**

**A.**

On the morning of March 2, 2012, while filling out his travel logs at a truck stop in Missouri, Filek suffered a pulmonary embolism and died. The next day, Dr. Edward Adelstein, the deputy medical examiner at the University of Missouri, conducted an autopsy.

Dr. Adelstein found that Filek was overweight and suffered from significant coronary artery disease. Nonetheless, Dr. Adelstein decided that these conditions were not the direct cause of Filek's death. After opening Filek's chest, Dr. Adelstein found a large "saddle pulmonary embolus" protruding from both of Filek's pulmonary arteries, and extending into the small branches of Filek's lungs. The only trauma Dr. Adelstein found was a superficial abrasion to Filek's nose, which Dr. Adelstein attributed to Filek hitting his head on the steering wheel upon dying. Thus, Dr. Adelstein determined that the large saddle pulmonary embolus was the cause of death.

According to Dr. Adelstein, the most common and unifying factor in pulmonary embolism cases is a very sedentary lifestyle, where one frequently sits for extended periods of time without getting up. As Dr. Adelstein explained, sitting forces veins in the legs to dilate, and doing so for long stretches of time without getting up allows blood to pool in the lower extremities, facilitating the formation of clots. Furthermore, he testified that repeatedly sitting for long periods of time can cause the veins to become permanently dilated, e.g., varicose veins, making a person more susceptible to forming blood clots. Thus, Dr. Adelstein identified the practice of truck drivers sitting for six to eight hours per day as a "significant risk factor for inducing [pulmonary embolisms]," and stated that pulmonary embolisms are a "normal risk" of the occupation. He also opined that Filek's pulmonary embolism was "strongly related to his choice of occupation."

However, Dr. Adelstein also testified that merely sitting for a long period of time, without necessarily having done so repeatedly in the past, is itself a risk factor for developing clots. Similarly, Dr. Adelstein could not confirm that Filek's embolus had formed in his legs, because he did not open up Filek's legs, citing his belief that doing so makes preparing a body

for funeral almost impossible. Rather, Dr. Adelstein testified that—at least from the exterior— Filek did not display any signs of permanent vein dilation from repeated sitting, and in fact looked so healthy from the exterior that, prior to opening his chest, Dr. Adelstein assumed that Filek had died of a heart attack. Dr. Adelstein also testified that there are many potential causes of pulmonary emboli, and that Filek's cardiac disease and generally unhealthy lifestyle were risk factors for him.

**B.**

On March 5, 2012, three days after her husband's death, Kim Filek filed a claim for coverage under Filek's "Truckers Occupation Accident Insurance" policy (the Policy) with National Union, a subsidiary of AIG. After several rounds of review and an internal appeal, Defendant denied coverage.

First, Defendant found that Filek's death was not covered by the "Occupational Accident Provision" because there was no evidence that Filek's "death was due to a bodily injury caused by an accident." Second, it found that Filek's death was not covered by the "Occupational Cumulative Trauma Provision" because there was no "traumatic assault on the body." Last, Defendant found that, even if the pulmonary embolism was a covered injury, coverage was not proper because it appeared that Filek's pulmonary embolism "was related to a sickness/disease."

The Estate sued in state court, challenging Defendant's denial of coverage on two grounds: breach of contract and denial of coverage in bad faith. Defendant removed to federal court based on the diversity of citizenship between the parties. After the parties filed cross-motions for summary judgment, the district court granted Defendant's motion and denied the Estate's. This appeal followed.

## II.

We review a grant of summary judgment de novo, construing all reasonable inferences in favor on the nonmoving party—the Estate. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Summary judgment is appropriate only where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Because jurisdiction in this case is based upon diversity of citizenship of the parties, we apply state law in accordance with the . . . decision of the highest . . . court" of the state from which this case was removed. *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994). Here that state is Michigan.

## A.

The Estate first challenges the district court's holding that Defendant did not breach the contract in denying Filek's claim. For the Estate to prevail, it must demonstrate that Filek's pulmonary embolism is a covered Injury under the Policy, either under the "Occupational Accident Provision" or the "Occupational Cumulative Trauma Provision." Additionally, the Estate must show that Filek's pulmonary embolism was not related to a sickness or disease.

Per Michigan law, "we examine the language of the insurance polic[y] and interpret [its] terms in accordance with well-established Michigan principles of construction." *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999). Thus, we enforce the Policy according to its terms, giving those terms their "commonly used meaning." *Id.* (citation omitted).

### 1.

The "Occupational Accident Provision" states that "Injury means bodily injury to an Insured Person *caused by* an Occupational accident . . . ." R. 15-2, PID 181 (emphasis added).

The Policy does not define the term "accident." The district court found that Filek's pulmonary embolism was the result of his "own internal reaction to the ordinary performance of his job, i.e., sitting for a prolonged period of time." Furthermore, it found that neither prolonged sitting nor a resulting clot fell into the common meaning of accident—an unusual or unexpected event external to the insured. Therefore, the district court held that Filek's injury was not *caused by* an accident.

The Estate alleges that the district court erred because it based its reasoning on two cases interpreting very similar contract language in the context of passenger air travel. *See Air France v. Saks*, 470 U.S. 392 (1985); *Bliss v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 132 F. Supp. 3d 676 (D. Md. 2015). In *Air France*, the Supreme Court found that Article 17 of the Warsaw Convention —"The carrier shall be liable for . . . any . . . bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft . . . ."— required "an unexpected or unusual event or happening that is external to the passenger" to occur for liability to arise. 470 U.S. at 397, 405. Similarly, it held that "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident . . . ." *Id.* at 406. In *Bliss*, relying on *Air France*, the District Court of Maryland held that insurance-policy language—"National Union agreed to provide accidental death benefits to its employees if 'injury to the employee result[ed] in death within 365 days of the date of the accident that caused the injury,'" and "[i]njury is defined as 'bodily injury caused by an accident'"—required an accident independent of the injury, that was not an "internal, biological process," for liability to arise. 132 F. Supp. 3d at 679, 682 (internal brackets and citations omitted).

As the district court noted, the language triggering liability in these cases is substantively the same as the language here: requiring the covered injury to be "caused by" an accident. Likewise, in Michigan, "[a]n 'accident,' within the meaning of policies of accident insurance, . . . is an undersigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, not anticipated, and not naturally to be expected." *Guerdon Indus., Inc. v. Fidelity & Cas. Co. of N.Y.*, 123 N.W.2d 143, 147 (Mich. 1963) (quoting Couch on Insurance (2d ed. 1962), § 41:6, p. 26)). Thus, the language of the policy here, like in *Air France* and *Bliss*, states that Defendants will cover bodily injuries that are the *result* of unanticipated or unusual events, not bodily injuries that are *themselves* unanticipated or unusual. Reliance on these cases, therefore, was not unfounded.

Here, there was no unanticipated event that *caused* Filek's pulmonary embolism. All the evidence suggests that Filek's body naturally formed the clot, independent of any unusual or unanticipated occurrence. Dr. Adelstein described clot formation due to extended sitting as both a "normal" and "significant risk." Consequently, under Michigan law sitting in this case cannot be considered an "accident." *See Guerdon Indus., Inc.*, 123 N.W.2d at 147.

The Estate also argues that Filek's pulmonary embolism should qualify because it was both a bodily injury and an accident, i.e., an unexpected or unintentional incident. However, to substitute "pulmonary embolism" for both "bodily injury" and "Occupational accident," as the Estate suggests, would make the "Occupational Accident Provision" a tautology: "Injury [includes] [pulmonary embolism] to an Insured person caused by a [pulmonary embolism]." This makes no sense. Because Michigan courts read contract provisions according to their clear meaning, giving effect to every word, we decline to adopt such a reading. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).

Thus, we affirm the district court's conclusion that Filek's pulmonary embolism cannot qualify as an Injury under the "Occupational Accident Provision" of the Policy.

**2.**

The Estate also claims that the district court erred in concluding that Filek's pulmonary embolism does not qualify as an Injury under the "Occupational Cumulative Trauma Provision."[1] This argument also fails.

The "Occupational Cumulative Trauma Provision" states in relevant part that "Injury" also includes "bodily injury to an insured person caused by the combined effect of *repetitive* Occupational activities extending over a period of time, where . . . such activities resulted directly and independently of all other causes in a Covered Loss." R. 15-2, PID 181 (emphasis added). Filek's pulmonary embolism is not entitled to coverage under this provision for two reasons.

First, there is no trauma here. "Trauma" is defined as "an injury (such as a wound) to living tissue caused by an extrinsic agent." *Trauma*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/trauma (last visited July 10, 2017). To say that sitting fits within this definition is a stretch.

Second, there is no evidence in the record that Filek's pulmonary embolism was caused directly from him *repeatedly* sitting for extended periods of time. Dr. Adelstein testified that sitting for *a* long period of time creates a risk for *anyone* to develop clots in their legs that can turn into pulmonary emboli. And although he testified that frequently sitting for extended periods of time *can* cause the veins to permanently dilate, e.g., varicose veins, and make one

---

[1] Defendant argues that the Estate did not properly present this argument to the district court. We disagree. In its motion for summary judgment, the Estate brought the relevant portion of the contract to the district court's attention. Furthermore, at oral argument for summary judgment, defense counsel and the court argued at length over the provision, as they both apparently believed the argument was before the court.

more susceptible to forming blood clots, Dr. Adelstein did not find any evidence of such permanent damage here. Dr. Adelstein testified that the exterior of Filek's legs looked healthy and dissimilar from legs which are prone to forming clots in them, so much so that before actually examining Filek's heart and lungs he had assumed Filek died of a heart attack. Thus, combined with the fact that Dr. Adelstein did not examine the interior of Filek's legs and veins, or actually determine that the embolus was formed in his legs, there is no evidence in the record that Filek's *repeated* extended sitting directly and independently resulted in his pulmonary embolism.

Consequently, we find that denial of coverage was proper. Furthermore, because Filek's pulmonary embolism is not a covered Injury, we need not address whether it is a sickness or disease.

**B.**

Finally, the Estate challenges the district court's dismissal of its bad-faith claim from the bench at oral argument. It alleges that all of Defendant's claim adjusters "stretched the contract language to find the pulmonary embolism to be a 'sickness'"; were "determined" not to classify Filek's pulmonary embolism as an accident, notwithstanding Dr. Adelstein's testimony; and failed to seek independent medical review in arriving at a decision. Appellant's Br. at 33-36.[2]

The Estate's bad faith claim rests on the assumption that coverage was improperly denied. However, as we have shown, denial here was proper. Therefore, we need not address this claim.

---

[2] In its reply brief on appeal, the Estate also argues that Defendant acted in bad faith by not defining the term "accident" in the contract and thereby intentionally creating an ambiguity. Appellant's Reply Br. at 8. Because this argument is raised for the first time both on appeal and in a reply brief, we deem it waived. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

**III.**

As the district court noted, "Filek purchased occupational accident insurance, not life insurance, and the premium he paid likely reflected the much more limited nature of the coverage. 'Under [Plaintiff's] interpretation, almost any death would be an accident and the Court would effectively transform this accidental death benefit into a life insurance policy.'" R. 26, PID 803 (quoting *Bliss*, 132 F. Supp. 3d at 683 (internal quotation marks and citation omitted)). Thus, for the aforementioned reasons, we affirm the judgment of the district court.