NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0587n.06

No. 16-4011

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| SCOTTIE A. BAGI; GARY C. VOJTUSH, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| CITY OF PARMA, OHIO, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

FILED
Oct 26, 2017
DEBORAH S. HUNT, Clerk

BEFORE: CLAY, COOK and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**

Plaintiffs-Appellants Scottie Bagi and Gary Vojtush (collectively "Plaintiffs") appeal the district court's grant of summary judgment to Defendant-Appellee the City of Parma, Ohio. For the reasons set forth below, we AFFIRM.

## I.     Background

Plaintiffs are firefighters and medics for the City of Parma Fire Department (PFD). Bagi has held this employment since 1999, and Vojtush since 1995. The PFD maintains a "Tactical Emergency Medical Specialist" (TEMS) unit consisting of specially trained firefighter medics who provide emergency medical support to the city police department's SWAT team in high-risk situations. In the event of an injury, TEMS unit members treat the police first, then innocent bystanders, then criminals. The record does not indicate the specific benefits, if any, that accrued to members of the TEMS unit, but in the grievance letter at the center of this litigation

Bagi asserted, "These SWAT positions are important to all of us. It is a way to both enjoy and advance our careers." (R. 54-3, PID 267.)

The TEMS unit was first formed sometime in the 1990s but was disbanded around 1999. In 2004, Fire Chief French directed Captain Poznako to reinstate the TEMS unit. Poznako adopted a test for interested candidates, drawn from a third-party test bank (2004 test). It was not a civil service test and there is no allegation that it was required to be; ultimately, French had discretion to appoint whomever he wanted to the TEMS unit. Poznako emailed the firefighters on February 13, 2004, announcing the 2004 test. Among the minimum qualifications he specified in the email was two years of service with the PFD. Poznako administered the 2004 test, which Bagi did not pass.

Some firefighters perceived unfairness in the way the 2004 test was administered, and in support of Plaintiffs' opposition to the City of Parma's motion for summary judgment, Bagi declared that Poznako told Bagi that members of the city's SWAT team demanded that a certain firefighter be chosen for the TEMS team. Firefighter Whelan testified that multiple firefighters selected the same wrong answers for a number of questions on the 2004 test and therefore credit was ultimately given for more than one answer to those questions. As a result, some firefighters' scores rose and some passed who had not before. Bagi's score increased, but he still did not pass. In 2009, Bagi brought his concerns about the 2004 test to the attention of the new union president, Patrick Lovejoy. Lovejoy investigated and found no improprieties in the administration of the 2004 test.

A TEMS unit member was removed in 2009. In 2011 the PFD held a second TEMS unit test (2011 test) to fill the empty spot and an additional position. Poznako emailed the PFD firefighters on June 6, 2011 to announce the test. Among the minimum qualifications he

specified in the email was three years of service with the PFD. (The years-of-service requirement was increased by one year to match the police department's years-of-service requirement for membership on the SWAT team.) Bagi promptly responded that he would like to take the test. On June 27, Poznako emailed all the firefighters who had expressed interest in the test, including Bagi but not Vojtush, to notify them of an upcoming informational meeting. Bagi did not attend, but he emailed Poznako the next day requesting any information he would need to know for the test. Poznako set aside study materials for Bagi, but Bagi did not pick them up. Bagi asked firefighter Fetter for the study materials and received those. On July 12, Bagi emailed Poznako asking who would be creating the test. He later testified that he wanted to ensure that there was no bias such as he had perceived in the past.

The test was held in August 2011. Again, it was not a civil service test. It consisted of five sections: "a written, a practical, a physical, run report documentation, and then also an interview," as it had in 2004. (R. 56-1, PID 722–23.) The written "run reports" that were evaluated were those that firefighters had previously prepared on the job following calls. The written test was multiple choice. Whelan, who took the 2004 test, selected the written and physical portions of the 2011 test, and scored those portions of the test. Firefighter Frantz evaluated the run reports, as he had done in 2004. His grading apparently was not blind. Firefighter Bazemore and a Dr. Schikowski graded the practical trauma assessment. The police SWAT commander was in charge of the oral interview and only police were involved in grading it. Whelan calculated the total scores. The interview portion involved some measure of subjectivity. Poznako had a role in administering the test, although he does not appear to have had any direct role. He was present in the room during interviews, but he did not take part. He

did not take part in writing the written test, did not receive the answer key, and first saw it only a day or two before it was given. Bagi did not take the test.

Before the test, on about July 8, 2011, Bagi began drafting a letter expressing his concerns that the test would not be administered fairly. He had a friend who is a lawyer proofread the letter. At the time he drafted the letter, the information Bagi had about the 2011 test included the materials Fetter provided him and Bagi's email correspondence with Poznako concerning the test. The letter states:

July 20, 2010

To Chief French,

In the near future, a member of this Parma Fire Dept will be selected for the SWAT team. It is important that an issue regarding the selection process be brought to your attention.

The previous testing procedure for SWAT selection have [sic] given many of us great pause. We were concerned previously that there was bias in the SWAT selection by Captain Poznako. Specifically, friends or close associates with Captain Pozanko [sic] seemed to be selected when they were universally believed not to be the best candidates through both objective and subjective criteria. However, they made it onto the SWAT team regardless.

Captain Poznako has created a test for the SWAT team. This is a test made up by Captain Pozanko [sic] and is not a standardized test. Many of us have put significant hours into studying for this test only to find we were not selected. All of us fully understand there is a realistic high risk that we will not be the best performer on the test and will not be accepted onto the SWAT team. That is acceptable to all of us.

However, there has been discontent within your ranks as many are under the belief that Captain Poznako gave the answers, or at least identified the areas to specifically study, to his friends and close associates so they could perform well on the test. This is horribly improper and demoralizing for us.

This letter is being written in advance of the next test. Captain Poznako is a close friend of FF Fetter. Enclosed you will find a picture of them together at FF Fetter's daughter's graduation party. They openly acknowledge to be friends—which is not in any way improper. FF Fetter is a good fireman and a likeable person. However, objectively he only has five years experience with the Department. It is our belief that he will be selected onto the SWAT team. Again, FF Fetter is a good person and is a good fireman. What FF Fetter does not understand is that his credibility within the ranks of the Parma

Fire Dept. will be depreciated significantly amongst us when he is selected due to bias of Captain Poznako.

These SWAT positions are important to all of us. It is a way to both enjoy and advance our careers. The selection of SWAT team members should be handled in a controlled manner not subject to personal whims. If a less qualified person is selected for a SWAT position due to improper selection (such as giving answers in advance), there becomes a complete lack of interest in any of us putting forth the effort to become better fireman/paramedics [sic]. Many of us have had to make a tough decision on whether to even apply for, much less study for significant hours, for a test where the outcome is predetermined. The motivation to excel in this department is diminishing due to such improper bias at the Captain's level.

Again, this letter is being written in advance of the selection of the SWAT team member. You will find this letter has been sealed continually since it was mailed and it was sent on the postmarked date. While all of us hope we are wrong, the fact that you have even opened this letter and had to read it has shown that our prediction of the future has come to fruition.

We ask for your intervention to stop such conduct in the future. . . .

(R. 70-2, PID 1171–72.) The letter included as an attachment a photograph of Poznako with Fetter and others at Fetter's daughter's graduation party. The letter was signed by Bagi, Vojtush and five others. Many of the signatories admitted they did not read the letter or only read part of it, including Vojtush. The letter is dated July 20, 2011. Bagi mailed the letter to himself by certified mail.

In October 2011, PFD selected firefighters Fetter and Iacoboni for the TEMS unit. On October 15, Bagi presented his unopened letter to union vice president Marty Cooper, asking that he deliver the letter to Chief French. Cooper showed it to union president Lovejoy, who was unwilling to deliver the envelope to French without knowing its contents and therefore opened it and read the letter. Lovejoy asked Bagi what basis he had for his allegations, and subsequently refused his request to deliver the letter, noting that he had found no improprieties in the 2004 test as Bagi had alleged. Bagi asked for the letter back. Lovejoy left the letter with the chief's

secretary for Bagi to collect. Bagi contacted the secretary and she delivered it to the chief. Bagi also delivered a copy of the letter to the director of human resources.

Assistant Chief Ryan conducted an investigation into the allegations in Bagi's letter. Ryan interviewed the six signatories. The investigation found that the letter was incorrect in numerous respects, including the years-of-service requirement and whether the test was created by Poznako rather than standardized. Ryan also interviewed Poznako, Fetter and Iacoboni. In a January 3, 2012 letter to Chief French, Ryan concluded that Bagi's allegations concerning sharing answers or areas to study were false. He added, "In fact not one of the [signatories] could provide any evidence when interviewed. I believe the allegations are false and based on rumor rather than any factual evidence." (R. 54-30, PID 439.) The arbitrators in the proceedings Bagi and Vojtush instituted challenging their discipline in response to the letter also concluded that the allegations were false.

The signatories were disciplined. On April 16, 2012, Bagi and another signatory were involuntarily transferred to other stations; Bagi's shift was also changed. On August 12, 2012, Vojtush was placed on paid administrative leave. The fire chief issued termination letters to Bagi and Vojtush on August 14. The city then placed Bagi on paid administrative leave on September 4. Bagi was given a thirty-four-shift suspension. He grieved the suspension and the arbitrator reduced it to eight shifts. The arbitrator concluded that Bagi did not knowingly make false statements, primarily because he could not believe that Bagi would do so knowing the consequences. Vojtush was given a thirteen-day suspension, which was reduced in arbitration to two days. All of the other firefighters who signed the letter were suspended for two days.

On March 13, 2014, Plaintiffs Bagi and Vojtush filed the instant lawsuit. Plaintiffs brought one claim of First Amendment retaliation under 42 U.S.C. § 1983. Plaintiff Vojtush also

brought a claim of Family and Medical Leave Act (FMLA) retaliation, which he voluntarily dismissed.

After discovery, the City of Parma brought a motion for summary judgment. It argued (1) that the letter is not First Amendment-protected speech because it was issued with reckless indifference to the falsity of the statements it contained; (2) the statements were made by Plaintiffs in their official capacities and thus they were not speaking as citizens for First Amendment purposes; (3) the subject of the letter is not a matter of public concern; and (4) the City of Parma's interest in running the PFD outweighed Plaintiffs' speech interests.

Plaintiffs argued that although the allegations in the letter turned out to be baseless, they had reason to believe they were true. A number of firefighters harbored concerns over Poznako's administration of the 2004 test. Also, the interview portion of the 2011 test involved some measure of subjectivity. In support of Plaintiffs' opposition to the City of Parma's motion for summary judgment, Bagi declared that firefighters were confused about the number of years of service required for eligibility for the TEMS unit.[1] The testimony of a number of firefighters demonstrated some uncertainty about the years-of-service requirement. Moreover, a number of firefighters testified that Poznako has a difficult personality. Poznako told one firefighter he "had a target on his back" for failing to decide to join Poznako's shift quickly enough. (R. 59-1, PID 865–66.) Another testified that Poznako could lose his temper over things that would cause no other officer to do so. Bagi believed Poznako enforces rules as to some firefighters and not others, but claimed to like him.

---

[1] The letter indicates that Bagi (correctly) believed Fetter had five years of experience at the time of the test, which would satisfy even the most stringent of the various years-of-service requirements discussed. However, Bagi now claims he believed that Fetter had fewer than five years of experience.

The district court determined that the letter is not First Amendment-protected speech because it was issued with reckless indifference to the falsity of the statements it contained. The district court did not reach the City of Parma's other arguments.

## II.  Discussion

The court reviews de novo the district court's grant of summary judgment. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Where there are no disputed, material facts, we determine, *de novo*, whether the district court properly applied the substantive law." *Gillis*, 845 F.3d at 683–84 (quoting *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004)).

Section 1983 provides, "Every person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. "Section 1983 creates a 'species of tort liability'" for these violations. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (citation omitted). Accordingly, a prima facie § 1983 claim has "the following two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998).

The City of Parma does not dispute that it was acting under color of law. Accordingly, we address only whether the City of Parma's actions deprived Plaintiffs of federal rights.

This court uses a burden-shifting framework to evaluate claims of First Amendment retaliation. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

> A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct. If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.

*Id.* (citation omitted); *see also Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001).

The City of Parma does not dispute that the suspensions Plaintiffs suffered constituted adverse actions. Nor does it dispute that the PFD's disciplinary actions were motivated by Bagi's letter. Accordingly, we focus on whether Plaintiffs' speech was protected, a question of law, *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 464 (6th Cir. 2017), that we review de novo, *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000).

"When the plaintiff is a public employee, []he must make additional showings to demonstrate that h[is] conduct was protected." *Id.* First, "the employee must speak as a private citizen and not as an employee pursuant to his official duties." *Mayhew*, 856 F.3d at 462 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Second, the employee must speak on a matter of public concern. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Third, the employee must show that his interest in commenting on the matter of public concern outweighs the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Id.* (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty.,*

*Illinois*, 391 U.S. 563, 568 (1968)). Separately, an employee's false statements are unprotected if they were made with "intentional or reckless disregard for the truth." *Westmoreland v. Sutherland*, 662 F.3d 714, 722 (6th Cir. 2011). Because the second requirement is dispositive here, we proceed to it directly.

"Whether or not a plaintiff's speech touches on a matter of public concern is a question of law." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 543 (6th Cir. 2012). It "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) (citation and internal quotation marks omitted). "In general, speech involves matters of public concern when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (citation omitted); *see also Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997) ("[T]he First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information").

"[M]atters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg*, 253 F.3d at 898. "Generally, '[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'" *Id.* (citation omitted); *see also Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988) (employee grievances concerning managerial incompetence may raise issues

of public concern if corruption involved); *Mayhew*, 856 F.3d at 469 (matters of public concern not limited to illegal acts). This court has contrasted matters of public concern with "the quintessential employee beef: management has acted incompetently." *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 365 (6th Cir. 2007) (quoting *Barnes*, 848 F.2d at 735). "It is not 'necessary for the entire expression to address matters of public concern, as long as some portion of the speech does.'" *Mayhew*, 856 F.3d at 467–68 (citation omitted). If the court finds "that the employee's personal interest *qua* employee predominates over any interest he might have as a member of the general public, we are not to intercede." *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989). However, the notion that the employee's motivation could be dispositive is "plainly illogical and contrary to the broader purposes of the First Amendment." *Chappel*, 131 F.3d at 574; *see also Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 894 (6th Cir. 2003) (overturning district court that had found that employee's motivation for speaking could dominate the substance of the speech and render the communicative purpose purely a matter of personal concern).

Under this test, Bagi's letter concerned personnel and internal policy issues, not matters of public concern. In essence, Bagi's letter asserted that the candidates were not treated fairly because a prior test was administered improperly and the upcoming test was likely to be equally unfair because of Poznako supplying answers or study areas to Fetter, a form of personal favoritism. Plaintiffs did not allege that Fetter was unqualified or that the administration of the 2011 test put the members of the SWAT team or the public at risk; Plaintiffs even stated that Fetter is a good firefighter. Nor did they allege nepotism or corruption. Even if the allegations were true, they would not alone show any violation of law because the position was not subject to civil service rules and the fire chief had complete discretion in appointing members of the

TEMS unit. [2] The letter alleged "the quintessential employee beef: management has acted [unfairly]." *Haynes*, 474 F.3d at 365. This is not a "subject of general interest and of value and concern to the public," *Lane*, 134 S. Ct. at 2380 (citation and internal quotation marks omitted), or one "about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government," *Brandenburg*, 253 F.3d at 898 (citation and internal quotation marks omitted). Finally, Bagi's personal interest *qua* employee appears plainly to predominate over his interest in the administration of the TEMS unit test as a member of the public. The letter itself states that admission to the TEMS unit is important to the signatories for their careers. After failing the test in 2004, Bagi complained about the administration of that test to Lovejoy five years later, and Bagi emailed Poznako in December 2010 seeking admission to the TEMS unit to "improve [his] career" at the PFD. (R. 54-16, PID 406.)

Analogous cases in this circuit further support that Bagi's letter did not address a matter of public concern. In the cases in which this court has found speech about hiring to touch on matters of public concern, the speech involved hiring for official positions, and concerned much more serious allegations tending to show public corruption. In *Mayhew*, this court found that speech concerning certain hiring decisions at a wastewater treatment facility touched on matters of public concern, reversing the district court on this issue. 856 F.3d at 467–69. Mayhew was an employee of the town's wastewater treatment plant. *Id.* at 459. One of his fellow supervisors, Noble, essentially was fabricating the results of water sampling and pressured Mayhew to do the same. *Id.* Mayhew reported this to the plant manager. *Id.* at 460. But then the city manager

---

[2] Theoretically, such a test could be illegal if applied in a discriminatory way or for other reasons, but there are no such allegations here.

promoted Noble to the plant-manager position and promoted the city manager's nephew to the chief-operator position. *Id.* Mayhew emailed the human resources department complaining that neither new hire was qualified; both had been hired outside of normal hiring procedures; and Noble had a history of bad practices. *Id.* at 460–61. Human resources unhelpfully forwarded the email to the city manager and Mayhew eventually was fired. *Id.* at 461. This court held that although Mayhew clearly had a personal interest in his emails, they touched on a matter of public concern sufficient to qualify as protected speech because they concerned the hiring process in general and alleged that the new hires were unqualified. *Id.* at 468–69. Although this allegation is somewhat similar to the allegation in Bagi's letter, the issues Mayhew raised are of much greater public concern. First, Mayhew's letter addressed hiring and promotion decisions, whereas membership on the TEMS unit is not a position or rank. Second, Mayhew also asserted based on first-hand knowledge that Noble carried out his wastewater-monitoring duties dishonestly and pressured fellow employees to do so as well. Promoting such a person to plant manager raises a matter of public safety and concern. Additionally, Mayhew implicitly alleged that nepotism underlay the decision to hire the other unqualified applicant.

Similarly, in *Banks*, an applicant for a primary teaching position at an elementary school who was not hired submitted a formal written complaint to the statewide office of education accountability alleging that the school failed to follow its policies and procedures in hiring the candidate who was selected, and that there had been irregularities in the hiring of three other teachers. 330 F.3d at 891. This court found that the plaintiff's complaint was "'mixed speech' involving both personal and public matters," noting that in addition to the failure to follow hiring procedures, the plaintiff alleged financial mismanagement, nepotism and improper certification of staff. *Id.* at 895. The court held that the allegations touched on public concerns including

(1) failure to follow state law; (2) hiring non-certified employees, which could negatively impact the quality of student education; (3) failure to post vacancies, which could have deprived qualified members of the community of the opportunity for employment; (4) "favoritism/nepotism," which might have deprived community members of the opportunity to participate in an impartial interview; (5) the community's general interest in knowing how its teachers are hired and when the district does not follow its own hiring practices; and (6) paying employees who are not qualified.[3] *Id.* at 896–97. Again, the primary differences between these concerns and the allegations in Bagi's letter are that Bagi did not allege that unqualified applicants were chosen or any violation of law, and membership on the TEMS unit is not a job or rank conferred by law.[4]

---

[3] As noted, the court in *Banks* overturned the district court, which had put too much emphasis on the plaintiff's personal motivations for speaking, but the court still relied on those motivations — rather than the content of the speech—to find that the speech was "'mixed speech' involving both personal and public matters." *Id.* at 894.

[4] See also *Miller v. Admin. Office of Courts*, 448 F.3d 887, 894 (6th Cir. 2006) (email complaining of loss of funding for juror-orientation video did not touch on matters that could affect the community, i.e., public concern); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 584 (6th Cir. 2000) (university's failure to comply with its own affirmative action employment policy was matter of public concern); *Buckley v. City of Portage*, 191 F.3d 451 (6th Cir. 1999) (newsletter addressing lack of availability of overtime pay, mishandling of property taken from fire scene, and alleged failure to follow proper procedures in hiring an officer did not touch on matters of public concern) (unpublished); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1186 n.8 (6th Cir. 1995) (collecting cases on matters of public concern); *Williams v. Com. of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994) (political patronage hiring and promoting practices were matters of public concern); *Kindle v. City of Jeffersontown, Ky.*, 374 F. App'x 562, 568 (6th Cir. 2010) (plaintiffs police officer and dispatchers' report that superior officer violated federal and state wage and hour laws among many other alleged infractions, corroborated by other officers' reports, touched on matter of public concern); *Fitzpatrick v. City of Frankfort, Kentucky*, 305 F. App'x 258 (6th Cir. 2008) (accepting district court findings that firefighter's speech concerning hiring did not touch on matters of public concern); *Serrato v. Bowling Green State Univ.*, 104 F. App'x 509, 514 (6th Cir. 2004) (complaint to university human resources concerning alleged death threat by co-applicant for job did not touch on matters of public concern).

Plaintiffs argue that the letter addressed a matter of public concern because it related to the workings of the PFD, relying primarily on *Mattox v. City of Forest Park*, 183 F.3d 515 (6th Cir. 1999). In *Mattox*, this court stated, "The speech at issue in this case concerned the workings of the Forest Park Fire Department and public safety, falling easily under the rubric of 'comments on matters of public concern.'" 183 F.3d at 521 (quoting *Pickering*, 391 U.S. at 568). However, the plaintiff in *Mattox* raised concerns about the fire department that included the "ransacking of a rescue unit, the placement of a lock on a hazardous materials truck, and the theft of some morphine," all of which resulted in an internal investigation by the fire department as well as a criminal investigation by the police force. *Id.* at 518. These are much more serious issues and more likely to affect the community's decisions on how to run its government. *Mattox* does not stand for the proposition that all aspects of the operations of a fire department constitute matters of public concern.

Plaintiffs also cite *Chappel*. In that case, the plaintiff raised concerns that the "ambulance district was not collecting billings; district funds were being misappropriated; training and standard operating procedures (SOPs) for employees of the fire district were inadequate; Welch was practicing nepotism; and Welch's position as both fire chief and chairman of the fire board created a conflict of interest." 131 F.3d at 568. Again, these are far-reaching and more serious concerns than the ones Bagi raised.

Bagi's letter was exclusively addressed to personnel matters. The focus was on the effects of the alleged unfairness in the test and selection procedure on the candidates, not the community: the absence of a standardized test, and Poznako's alleged assistance to and favoritism towards friends, is "horribly improper and demoralizing for us"; if Fetter, who is Poznako's friend, is chosen, "his credibility within the ranks of the Parma Fire Dept. will be

depreciated significantly amongst us when he is selected due to bias of Captain Poznako," notwithstanding that Fetter is a good fireman and a good person; the TEMS positions are important to the firefighters to both enjoy and advance their careers, and a predetermined test outcome diminishes their motivation to excel in the department. These concerns are addressed to management's fairness in a personnel matter, not matters of public concern. In contrast to the cases in which this court has found that hiring-related speech touched on matters of public concern, Bagi's letter is akin to the personnel matter in *Naghtin v. Montague Fire District Board*:

> Even though Naghtin's petition refers to 'the long term good of the Fire District, Fire Department, and its tax payers,' the thrust of his petition involves a request to reinstate Donald Roesler, whose removal from his post as Captain of the Department reeks of precisely the same 'internal office politics' that we have consistently found to be outside the scope of First Amendment protection.

674 F. App'x 475, 480 (6th Cir. 2016).

In sum, Bagi's letter did not discuss matters of public concern and therefore was not protected speech. Because we affirm on this alternative ground, we need not reach the question the district court found dispositive, whether Plaintiffs spoke with reckless indifference to the falsity of the content of their speech. Nor need we reach *Pickering* balancing.

## III. Conclusion

For these reasons, we **AFFIRM**.