NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0283n.06

No. 18-5045

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JAMES S. BARROW, | ) | **FILED** |
| | ) | May 31, 2019 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| LEO DANIEL COOK, | ) | |
| | ) | |
| Intervening Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| CITY OF HILLVIEW, KENTUCKY; | ) | |
| GLENN A. CAPLE, in his individual capacity; | ) | |
| KENNETH STRAUGHN, in his individual capacity, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: COLE, Chief Judge, WHITE and NALBANDIAN, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant James Barrow and Intervening Plaintiff-Appellant Leo Daniel Cook appeal the district court's grant of summary judgment to Defendants-Appellees City of Hillview, former Hillview Chief of Police Glenn Caple, and Major Kenneth Straughn. Asserting that they were retaliated against for their involvement in a federal investigation into wrongdoing by Caple, Plaintiffs alleged a civil conspiracy under 42 U.S.C. § 1985(2), a claim of First Amendment retaliation under 42 U.S.C. § 1983, and a state-law claim of tortious employment reprisal.[1] The district court granted summary judgment to Defendants on

---

[1] Plaintiffs also alleged a violation of section 2 of the Kentucky Constitution on the basis that the Defendants' actions "constitute the exercise of arbitrary governmental authority." (R. 6, PID 96.) The district court dismissed this claim, and Plaintiffs do not contest this decision on appeal. We therefore consider the claim abandoned. *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

all claims. We AFFIRM as to Plaintiffs' civil-conspiracy claim and state-law tort claim, REVERSE as to their First Amendment retaliation claim against Caple and Straughn, VACATE as to their *Monell* claim against the City, and REMAND for further proceedings consistent with this opinion.

## I.

### A.    Factual History

On January 4, 2012, four members of the Hillview Police Department—the two Plaintiffs and the two Defendants—went to the home of Mayor James Eadens after Eadens reported suspicious activity on his property. Eadens was not home when the officers arrived, but his son Allen was there. While looking around the yard, Straughn found a backpack tucked inside a tire behind the detached garage. The officers identified the contents of the backpack—a jar of liquid, tubing, and a curling iron—as materials used in the manufacture of methamphetamine. When Caple asked Allen about the backpack, Allen denied any knowledge of the backpack or its contents. Allen was handcuffed, and Barrow stayed with him while the other officers continued their search of the yard.

Cook and Straughn found two white plastic garbage bags behind a wire fence at the rear boundary of Eadens's property. The bags exuded a smell associated with methamphetamine production; Cook testified the bags gave off "a real strong chemical smell to the point that even the major stated that he was getting a headache." (R. 54-10, PID 1146.) Caple then ordered the officers to place the backpack behind the wire fence where the white garbage bags had been found. According to Cook, Caple stated, "the mayor didn't need that kind of heat." (R. 54-10 PID 1149.) Cook, who had experience handling drug-processing materials from working with the local county drug task force, volunteered to relocate the backpack. Cook knew at the time that moving the

backpack was a violation of standard operating procedure, but did it "[b]ecause the chief said, this is what we're going to do." (R. 54-10, PID 1153.)

While Caple and Cook were discussing moving the backpack, Barrow remained on the porch of the residence with Allen. As Cook walked to his car to get safety gloves, Barrow asked, "What are we going to do with the backpack in the back yard?" (R. 54-9, PID 1248.) According to Barrow, Cook responded, "there was no backpack in the yard; it was in the woods outside the fence." (*Id.*) Barrow, suspecting that the officers' conduct was either illegal or contrary to department policy, told Cook, "I'm done with this. You-all don't need me anymore." (*Id.* at PID 1248–49.) Cook then released Barrow from the scene. Barrow testified that as he walked to his car, Straughn ordered him not to discuss the incident with anyone, and Barrow gave him "a sarcastic salute." (*Id.* at PID 1249.)

The remaining officers called Mayor Eadens to report the discovery of the backpack. They explained that Allen had denied any involvement with the backpack or its contents, and Eadens instructed the officers to escort Allen off the property. Straughn took Allen to a nearby restaurant, and Caple called the county drug task force to clean up the items behind the fence.

Unsettled by Caple's decision to move the backpack off Eadens's property, Barrow reported the incident to the Bullitt County Sheriff's Office, which referred the matter to the Federal Bureau of Investigation (FBI). Barrow then met with FBI Agent Brett Johnson and gave his account of what happened. The FBI later contacted Cook, who confirmed Barrow's account. Barrow and Cook continued to cooperate with the FBI investigation. Barrow met with Agent Johnson "numerous times," and secretly recorded conversations with Caple and Straughn at the FBI's direction. (R. 54-9, PID 1232.) Cook spoke with the FBI at least one more time.

In May 2013, after the FBI investigation became a matter of common knowledge within the Hillview Police Department, Barrow admitted to Straughn and Caple that he had spoken with the FBI. Beginning around this time, he and Cook were subjected to disciplinary actions by Caple and Straughn.

On May 9, 2013, Caple reprimanded Barrow for speeding on the access road leading to the Hillview Police Department parking lot. The warning was Barrow's first reprimand in his four years with the police department.

On May 31, 2013, Cook received a written reprimand for mishandling a case. The disciplinary report states that Cook failed to investigate the matter within a year of the initial citizen complaint because he "forgot about the case." (R. 54-5, PID 423.)

On January 15, 2014, Barrow was reprimanded for violations of the Hillview Police Department's pursuit policy and the personal video-camera policy. These charges resulted in a suspension of two days and a written reprimand. Barrow appealed the suspension, but the Civil Service Board of Hillview upheld the punishment. Barrow requested that these two days of unpaid suspension be scheduled in separate pay periods in order to limit the financial effect. Straughn denied the request.

On May 7, 2014, Cook received a reprimand regarding his failure to properly fill out his daily log sheets.

On June 10, 2014, Eadens sent a letter to Straughn addressing Cook's "excessive absenteeism." (R. 54-5, PID 411.) According to the memo, Cook missed a total of 21 days due to illness between June 11, 2013, and June 10, 2014.

On July 7, 2014, Cook received notice from the Hillview Police Department Internal Affairs Unit that it intended to interview him with regard to complaints from two citizens who alleged that he failed to investigate crimes they had reported.

On August 19, 2014, Straughn sent a memo to Eadens regarding allegations that Cook deposited $2.50 each into the accounts of two inmates housed in the Bullitt County Detention Center. The memo recommended Cook's termination. Cook ultimately reached a settlement with the Hillview Police Department pursuant to which he accepted a demotion from detective to patrolman in exchange for the dismissal of all disciplinary charges against him.

Barrow and Cook allege these disciplinary actions were taken in retaliation for their communication with the FBI. They argue that some of the disciplinary actions are factually unfounded. For example, Barrow disputes that he was driving in the department parking lot at an excessive speed, and regarding Cook's alleged absenteeism, Cook argues, and Eadens concedes, that there is no evidence that Cook was not in fact sick on the days he was absent. Barrow and Cook also point to similar violations of the pursuit and personal-video policies by other Hillview police officers that did not result in official reprimands.

A grand jury indicted Caple on October 1, 2013, for lying to the FBI in violation of 18 U.S.C. § 1001(a). Barrow and Cook both testified against Caple in the subsequent criminal trial. Cook testified that he received no discipline after Caple's trial.

B.      **Procedural History**

Barrow filed a complaint in Bullitt County Circuit Court against the City of Hillview and Caple and Straughn in their individual capacities. Count I of Barrow's complaint alleged a violation of the Kentucky Whistleblower Act by the City of Hillview. Count II alleged that Caple

and Straughn conspired "to deter the Plaintiff from testifying freely, fully, and truthfully . . . and to punish him for doing so," in violation of 42 U.S.C. §§ 1985(2) and 1986. (R. 1-4, PID 13.)

Defendants removed the case to federal court. Defendants then moved to dismiss, arguing that the City of Hillview is not an employer for the purposes of the Kentucky Whistleblower Act, and that Barrow is unable to state a claim under 42 U.S.C. § 1985(2) because the individual defendants are protected by the intracorporate-conspiracy doctrine. Barrow filed an amended complaint, adding: (1) a state-law tort claim of "tortious employment reprisal," (2) a First Amendment retaliation claim, and (3) a claim that the disciplinary actions "constitute[d] the exercise of arbitrary governmental authority," in violation of section 2 of the Kentucky Constitution. (R. 6, PID 94–96.) Barrow abandoned his claim under the Kentucky Whistleblower Act. The district court denied Defendants' motion to dismiss, and discovery proceeded. Cook filed an intervening complaint on October 16, 2014. Cook's claims mirror those in Barrow's Amended Complaint.

Defendants moved for summary judgment, and the district court granted Defendants' motion as to all claims.[2] Regarding the section 1985(2) and 1986 claims, the district court held that Plaintiffs' claims are barred by the intracorporate-conspiracy doctrine because Defendants were acting as agents of the same entity—the City of Hillview—and therefore Plaintiffs had not alleged that at least two separate "persons" existed to form a conspiracy. With regard to Plaintiffs' state-law claim for "tortious employment reprisal," the district court held that Plaintiffs had not stated a claim because the cause of action requires that the employee actually be discharged, and neither Plaintiff's employment was terminated. Regarding the First Amendment retaliation claim, the district court found that Plaintiffs failed to show that they were engaged in protected First

---

[2] The district court found that it need not determine whether Defendants were entitled to qualified immunity because Plaintiffs had failed to show that Defendants violated any statutory or constitutional rights.

Amendment activity. Finally, the district court dismissed Plaintiffs' claim under section 2 of the Kentucky Constitution on the ground that the Kentucky Supreme Court has specifically declined to create a private right of action for money damages for violations of the Kentucky Constitution, and therefore Plaintiffs' claim for damages for the exercise of arbitrary governmental authority was not legally cognizable.

Plaintiffs now appeal.

## II.

We review de novo a district court's grant of summary judgment. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 461 (6th Cir. 2017) (citation omitted). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We construe the facts in the light most favorable to the non-moving party. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (citation omitted).

### A.    Civil Conspiracy

Plaintiffs assert two primary arguments regarding their civil-conspiracy claim. First, they argue that Caple's and Straughn's disciplinary decisions were outside the scope of their employment, and so the intracorporate-conspiracy doctrine does not defeat Plaintiffs' § 1985(2) claim. Second, Plaintiffs ask us to recognize a new exception to the intracorporate-conspiracy doctrine that would apply when an employee defendant is acting in his or her "personal interests," whether or not the employee is acting within the scope of his or her employment.

#### 1.    Scope of Employment

Section 1985(2) establishes a cause of action for conspiracy to, among other things, obstruct justice or to intimidate a party, witness, or juror. 42 U.S.C. § 1985(2). To state a cause of action under § 1985, a plaintiff must prove the existence of a conspiracy among two or more

persons. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991). However, if "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Id.* at 510. In other words, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). This is the "intracorporate-conspiracy doctrine." *Id.* We have held that the doctrine applies in § 1985(2) suits. *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984).

We recognize an exception to the intracorporate-conspiracy doctrine "when employees act outside the course of their employment." *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 841 (6th Cir. 1994). This exception acknowledges "a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place." *Id.* at 840. As a result, "when employees act outside the course of their employment, they and the corporation may form a conspiracy." *Id.* at 841. *See also Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment").

Here, Plaintiffs have not produced sufficient evidence to create a genuine dispute of material fact with regard to whether Defendants were acting outside the scope of their employment. As the district court observed:

> The disciplinary charges against Plaintiffs were made during the course of their working hours, all the charges were connected to the Hillview police department and its policies, and the disciplinary charges were subject to review by the Hillview Civil Service Board. Further, it is not relevant whether Plaintiffs actually committed the Hillview violations they were charged with; it is enough that the alleged retaliatory actions were connected to the "legitimate business" of the Hillview Police Department. *See Johnson*, 40 F.3d at 841 ("[I]t is not necessary that the complaints were based on fact.")

(R. 62, PID 1104.)  Although Plaintiffs assert that "Caple and Straughn were acting outside the scope of their employment in committing intentional retaliatory acts," (Appellant Br. at 26), this conclusion is not supported by the summary judgment record.  Our precedent makes clear that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Johnson*, 40 F.3d at 840 (quoting *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990)).  In *Johnson*, the plaintiff alleged that her co-workers' critiques of her performance were motivated by racial bias, and therefore outside of the scope of their employment as hospital staff. We found that, even accepting the plaintiff's allegations of bias as true, the "plaintiff ha[d] failed to overcome the facts that the employees' complaints were made during the course of their working hours, the remarks were connected to the business of the hospital, and they were forwarded to the proper managerial authorities."  *Id*. at 841.  The *Johnson* court distinguished the individual defendants' actions in that case from situations "where the aim of the conspiracy exceeds the reach of legitimate corporate activity."  *Id*. at 840.  "For example, a manufacturing corporation's employees might not be within the intracorporate conspiracy exception if, for racially discriminatory reasons, they attempted to prevent a person from renting an apartment owned by another company." *Id*. at 840–41.  In the instant case, Defendants were responsible for enforcing police discipline,[3] and the decisions at issue were made during work hours, on City property, by the police department's management team.  In short, "the aim of the conspiracy [did not] exceed[] the reach of legitimate corporate activity."  *Id.* at 841.

---

[3] The Hillview City Code provides that the Chief of Police shall "[m]ake and review all personnel assignments within the Department," "[m]ake recommendations to the Mayor and City Council for the appointment, promotion and dismissal of officers," and "[e]nforce disciplinary measures when necessary."  Hillview, Ky., Code of Ordinances § 35.10.  Straughn, as a senior officer in the department, also enforced internal discipline.

Plaintiffs further contend that Caple's authority as Chief of Police was restricted to administrative duties during the period he was under federal indictment, and therefore any actions he took to discipline Plaintiffs were beyond the scope of his employment.[4] In his deposition, Caple conceded that he was in the meeting when Straughn and two other officers decided that Barrow should receive a two-day suspension and a written reprimand, and that rather than leave the meeting, Caple "basically announced that [he] would be abstaining . . . from anything from that point on with Officer Barrow." (R. 54-4, PID 297.) However, it is not clear that, even if Caple did in fact participate in the disciplinary actions against Barrow, his participation would not have been "administrative," and therefore within the proper scope of his employment while he was under indictment.

### 2. Personal Interests

Plaintiffs also urge us to recognize a distinct exception to the intracorporate-conspiracy doctrine "when individual actors are motivated by personal interests rather than the interests of their corporate employer." (Appellant Br. at 23.) Plaintiffs rely in large part on *Brever v. Rockwell International Corp.*, an out-of-circuit case in which two plutonium workers alleged a conspiracy to deter them from cooperating with the FBI in an investigation into environmental crimes at their workplace. 40 F.3d 1119 (10th Cir. 1994). The Tenth Circuit found that although the individual defendants were all employees of the same corporation, the intracorporate-conspiracy doctrine did not apply because the defendants had "an independent personal stake in achieving the corporation's illegal objective." *Id.* at 1127 (quoting *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985)). The court concluded that in seeking to deter the plaintiffs' cooperation with the FBI,

---

[4] Hillview Police Department standard 300.11 provides that an officer who is arrested or indicted "will be suspended from police duty and shall not exercise the powers of a sworn police officer until the case is settled or disposed of." (R. 54-5, PID 430–31.)

the defendants were "acting for their own personal purposes and not blindly executing corporate policy," and therefore "they became independent actors who can conspire with the corporation." *Id*. (citation and internal quotation marks omitted).

But *Brever* does not bear the weight Plaintiffs put on it. Although the specific phrasing of the "independent personal stake" rule supports Plaintiffs' proposed exception, the facts of that case demonstrate that the conspirators were also acting outside the scope of their employment. *Id*. Specifically, the *Brever* defendants' alleged acts of intimidation included harassing phone calls and mail, wiretapping the plaintiffs' home telephones, and vandalizing plaintiffs' vehicles, none of which could plausibly be considered within the scope of the defendants' employment at the plutonium facility. *Id*. at 1123–24. Thus, *Brever* does not actually stand for the proposition that acts motivated by personal interests that are within the scope of the defendant's employment are subject to § 1985 liability. We therefore affirm the district court's grant of summary judgment to Defendants on Count I.

We also affirm the grant of summary judgment on the § 1986 claim. Section 1986 provides a cause of action against persons who aid and abet violations of § 1985. 42 U.S.C. § 1986. Without a predicate violation of § 1985, there can be no violation of § 1986. *See Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc*., 32 F.3d 989, 994 (6th Cir. 1994). Accordingly, because Defendants are entitled to summary judgment on the § 1985(2) claim, they are also entitled to judgment on the § 1986 claim.

B.     **Tortious Employment Reprisal**

Count II of Plaintiffs' complaint alleges a claim of "tortious employment reprisal" under Kentucky state law. Plaintiffs assert that failing to report Caple would have violated Kentucky law, and therefore the adverse employment actions taken by Defendants against them constituted

unlawful retaliation. *See Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983) ("[A]n employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law.") (citation omitted).

The district court granted summary judgment to Defendants on this claim. Noting that the case law offered by Plaintiffs refers exclusively to the Kentucky tort of "public policy wrongful discharge," the district court construed Plaintiffs' claim as such. (R. 62, PID 1105–08.) *See Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010); *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). And, because Plaintiffs were not in fact discharged, the district court determined that Plaintiffs are unable to state a claim under this cause of action.

On appeal, Plaintiffs assert that this court should recognize a tort claim in favor of employees who suffer adverse employment actions in violation of public policy, but whose employment is not terminated. Plaintiffs argue that limiting an employee's ability to seek redress to instances of actual termination is contrary to public policy because an employer would be free to take any adverse employment actions short of termination without recourse. In support, Plaintiffs point to the various Kentucky statutes penalizing retaliation against employees who pursue workers-compensation claims, occupational-safety claims, and wage-and-hour claims, none of which limit the right to sue to instances of full termination. Plaintiffs also note that Kentucky courts have not expressly held that the public-policy tort applies only to instances of wrongful termination.

The district court did not err in finding that Plaintiffs failed to state a claim for tortious employment reprisal. In establishing a cause of action for public-policy wrongful discharge, the

Supreme Court of Kentucky defined specific limitations on any judicial exception to the state's employment-at-will doctrine. *Grzyb*, 700 S.W.2d at 401. These limitations are:

> 1. The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.
> 2. That policy must be evidenced by a constitutional or statutory provision.
> 3. The decision . . . whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Hill*, 327 S.W.3d at 421 (quoting *Firestone*, 666 S.W.2d at 731). Implicit in the first element is that a "discharge" occurred. *See, e.g.*, *Follett v. Gateway Reg'l Health Sys., Inc.*, 229 S.W.3d 925, 929 (Ky. Ct. App. 2007) ("a plaintiff must show at a minimum that he was engaged in a statutorily protected activity, that he was discharged, and that there was a connection between the protected activity and the discharge") (citation and internal quotation marks omitted). The Kentucky Supreme Court has discussed this tort exclusively in the context of actual employment termination. *See, e.g.*, *Wymer v. JH Props., Inc.*, 50 S.W.3d 195, 198–99 (Ky. 2001) (Kentucky law "recognizes a cause of action when an employee is terminated in contravention of statutory or constitutional provisions"); *Boykins v. Hous. Auth. of Louisville*, 842 S.W.2d 527, 530 (Ky. 1992) ("there exist two situations where the discharge of an employee violates fundamental public policy") (discussing *Grzyb*, 700 S.W.2d at 402). Although Plaintiffs' argument is not without logical force, we are bound to apply the substantive law of Kentucky as interpreted by the Supreme Court of Kentucky, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Bailey v. V & O Press Co., Inc.* 770 F.2d 601, 605 (6th Cir. 1985) ("we are not commissioned to take a position regarding the advisability or fairness of the state rule to be applied, but are to determine the issue as would the highest court of the state"), and the Supreme Court of Kentucky has given no indication that wrongful discharge really means wrongful discipline.

### C. First Amendment Retaliation

Count III alleges that Defendants violated Plaintiffs' First Amendment rights by retaliating against them for cooperating with the FBI investigation. We employ a burden-shifting framework to determine whether an employee has established a claim of First Amendment retaliation. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (citations omitted). To establish a prima facie case, the employee must demonstrate that: (1) the employee was engaged in constitutionally protected speech or conduct; (2) the employee was subjected to an adverse employment action that would deter a person of ordinary firmness from continuing to engage in that speech or conduct; and (3) the protected speech was a substantial or motivating factor for the adverse employment action. *Id*. (citations omitted). If the employee establishes a prima facie case of retaliation:

> [T]he burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff[s], no reasonable juror could fail to return a verdict for the defendant.

*Boulton v. Swanson*, 795 F.3d 526, 531 (6th Cir. 2015) (quoting *Benison*, 765 F.3d at 658).

The district court's analysis here did not extend past the threshold question: whether Plaintiffs' speech is protected by the First Amendment. The district court granted summary judgment to Defendants, concluding that Plaintiffs "failed to set forth any facts tending to support their argument that Cook and Barrow were acting outside the scope of their employment duties when they participated in the FBI investigation" and "do not offer any law or precedent supporting an argument that reporting misconduct or participating in an FBI investigation is protected speech." (R. 62, PID 1111.)

We recognize that Plaintiffs gave the district court little to support their First Amendment claim and seemed to concede the scope-of-employment issue in favor of an alternative theory of

the case. Plaintiffs approached the First Amendment claim as an alternative to their tort claim, and Defendants and the district court understood it as such. The district court noted that although alternative claims are permissible, Plaintiffs must still meet the summary judgment standard on each claim. Addressing the merits of the first prong of the First Amendment inquiry—whether the speech is protected—the district court determined that because Plaintiffs believed it was their professional duty to report Caple's suspicious conduct to outside law-enforcement, and their cooperation with the FBI was pursuant to that duty, Plaintiffs' communication with the FBI was not protected speech under the First Amendment. But Plaintiffs' perception of the legal status of their speech is not controlling; rather, the district court was presented with a question of law, and our review of its decision is de novo. *Mayhew*, 856 F.3d at 461–64. Considering the record before the district court, Plaintiffs have adequately established that their cooperation with the FBI is protected speech under the First Amendment.

We engage in a three-step inquiry to determine whether speech by a public employee is protected. *Id.* at 462. First, we ascertain whether the relevant speech addressed a matter of public concern. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). Second, we determine whether the employee spoke as a private citizen or as an employee pursuant to the employee's official duties. *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Third, we balance the interests of the parties and determine if the employee's speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

        1.      Matter of Public Concern

In determining whether an employee's speech addresses a matter of public concern, we examine "the content, form, and context of a given statement, as revealed by the whole record."

*Connick*, 461 U.S. at 147–48. An employee's speech "involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Mayhew*, 856 F.3d at 467 (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)).

Barrow's and Cook's statements to the FBI pertain to matters of public concern. Barrow contacted the FBI because he suspected that Caple had committed a crime by moving the backpack off Eadens's property. Cook "was informed [by the FBI] in the beginning that they were investigating . . . political corruption." (R. 54-10, PID 1161.) We have previously held on similar facts that reporting police corruption to the FBI is a matter of public concern. *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007). This is not a case in which a public employee claims First Amendment protection for speech made in an employment grievance, personnel dispute, or complaint regarding internal management. *See, e.g.*, *Bagi v. City of Parma*, 714 F. App'x 480, 486 (6th Cir. 2017) (allegations of mismanagement in fire department were internal personnel issues, not matters of public concern); *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007) (police dog handler's criticisms of department funding reflected "nothing more than the quintessential employee beef: management has acted incompetently"). Rather, this case falls within the Supreme Court's guidance that "[e]xposing governmental . . . misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425.

2. Private Citizen or Public Employee

The second element of the inquiry asks whether the employee spoke as a private citizen or as a public employee. In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as

citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  547 U.S. at 421.  The Court reasoned that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Id*. at 421–22 (citation omitted).  In *Lane*, the Supreme Court clarified that the director of a state program spoke as a citizen rather than as a public employee when he testified in the criminal prosecution of a former employee.  573 U.S. at 241–42.  The Court distinguished Lane's testimony from speech made pursuant to ordinary work responsibilities:

> *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment.  The *Garcetti* Court made explicit that its holding did not turn on the fact that the memo at issue "concerned the subject matter of [the prosecutor's] employment," because "[t]he First Amendment protects some expressions related to the speaker's job." *Garcetti*, 547 U.S. at 421, 126 S. Ct. 1951.  In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech.  The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Id*. at 239–40 (alterations in original).  In drawing this line, the Court specifically emphasized the significance of speech by public servants that relates to the administration of government agencies:

> There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees.  For government employees are often in the best position to know what ails the agencies for which they work.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.

*Id*. at 236 (internal citations, alterations, and quotation marks omitted).

Barrow's and Cook's speech was not within their "ordinary job responsibilities."  In making this determination, we consider several factors, including the speech's impetus, its setting, and its general subject matter.  *Mayhew*, 856 F.3d at 464 (citing *Handy-Clay v. City of Memphis*,

695 F.3d 531, 540 (6th Cir. 2012)). Relevant considerations also include "whether the statements were made to individuals up the chain of command," whether the speech occurred at the workplace, and whether it concerned the subject matter of the speaker's employment. *Handy-Clay*, 695 F.3d at 540 (citations omitted).

Several of our recent cases are instructive. In *Mayhew v. Town of Smyrna*, the laboratory supervisor at a water-treatment plant alleged retaliation by his supervisors for reporting that a colleague was improperly recording water-testing data. 856 F.3d at 461. We found that Mayhew's complaints fell within his ordinary job responsibilities because "his job was to oversee all water-sample testing required by state and federal regulations . . . and to report any [in]appropriate situations and accidents immediately to management." *Id*. at 464–65. We saw no meaningful distinction between the reporting of water-quality issues and the reporting of illegal activity by other employees, and rejected the argument that Mayhew's complaints "were borne out of his civic and 'moral responsibility,' not his job functions." *Id*. at 465. Because "Mayhew's entire function at the plant was to ensure water-testing standards were in compliance with federal and state regulatory mandates," his reports were not entitled to First Amendment protection. *Id*.

In contrast, we held in *Stinebaugh v. City of Wapakoneta* that a fire captain's discussions with city council members regarding the financial maladministration of the fire department constituted speech as a citizen. 630 F. App'x 522, 528 (6th Cir. 2015). We noted that (1) the plaintiff expressly stated he was contacting the city council members in his role as a concerned taxpayer, (2) the impetus for the speech was to voice his opinion about city resources, rather than internal fire department goals, and (3) the plaintiff was off-duty and out-of-uniform when he addressed the council members. *Id*. at 528. We concluded that although the plaintiff's speech

concerned a matter related to his employment, it was not made "pursuant to his official duties." *Id*. at 527.

The present case is similar to *Mayhew* in that Barrow and Cook, as police officers, have a general responsibility to uphold the law and report unlawful conduct. Just as reporting inappropriate water sampling was within Mayhew's ordinary responsibilities, reporting possible criminal conduct is within Barrow's and Cook's ordinary job responsibilities. *See Mayhew*, 856 F.3d at 465 (discussing "*Lane*'s instruction that we focus on his 'ordinary job responsibilities' and *Garcetti*'s mandate that we look at job duties practically").

What differentiates this case from *Mayhew*, however, is that although Barrow's and Cook's cooperation with the FBI concerned information they learned as police officers, their ordinary job responsibilities did not include reporting allegations of public corruption to outside authorities. Neither Barrow nor Cook was employed by the FBI, and their participation in the FBI investigation was distinct from their obligations as Hillview police officers. Indeed, Barrow secretly recorded conversations with Caple and Straughn at the FBI's direction; this was not within the ordinary responsibilities of a patrolman, which include "taking reports, traffic stops, investigating minor crimes and so forth . . . just normal patrol duties." (R. 54-9, PID 1218.) Further, Plaintiffs' speech was made without the knowledge or consent of their superior officers. Straughn actively discouraged Barrow from taking action by ordering him not to discuss the incident with anyone. And Barrow and Cook deliberately communicated outside the chain of command to ensure a neutral audience. Barrow testified:

> [T]he way I understood it, the Sheriff's office didn't want to investigate this, because if there was no crime, they didn't want to make it look like they were trying to cover something up. If there was a crime, they didn't want to have to enforce criminally on another agency or a member of the other agency or whatever.

(R. 54-9, PID 1228–29.)  Finally, Barrow's first in-person meeting with the FBI took place in Louisville, Kentucky, rather than in Hillview.  *See Stinebaugh*, 630 F. App'x at 527 ("Other relevant, but not dispositive, factors include where the speech occurred—inside or outside of the workplace.").   These facts all suggest that Plaintiffs' speech was outside the ordinary responsibilities of their employment.  It is therefore "speech as a citizen for First Amendment purposes."[5]  *Lane*, 573 U.S. at 238.

### 3. *Pickering* Balancing

The third step of the inquiry asks whether the government had "an adequate justification for treating the employee differently from any other member of the public" based on the government's needs as an employer.  *Garcetti*, 547 U.S. at 418 (discussing *Pickering*, 391 U.S. at 568).

In cases involving allegations of official misconduct and public corruption, "the employer's side of the *Pickering* scale is entirely empty."  *Lane*, 573 U.S. at 242.  If there was evidence that Barrow's or Cook's statements were false, or that they "disclosed any sensitive, confidential, or privileged information," then the government interest in regulating that speech may tip the scale in the employer's favor.  *Id*.  Defendants have not, however, presented any such evidence.

---

[5] Other courts have reached the same conclusion under similar facts.  *See Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016), *cert. denied sub nom Town of Ball v. Howell*, 137 S. Ct. 815 (2017) (town police officer's speech while assisting the FBI investigate his coworkers and superiors for disaster-assistance fraud was not within the ordinary scope of his duties); *Seifert v. Unified Gov't of Wyandotte Cty./Kansas City*, 779 F.3d 1141, 1152 (10th Cir. 2015) (testimony of police officer against fellow officers in a civil-rights lawsuit was protected because it "concerned his work but was not part of it").

4.      Conclusion on First Amendment Claim

Based on the summary judgment record, Plaintiffs have demonstrated that their cooperation with the FBI was protected speech under the First Amendment. We therefore reverse the district court's grant of summary judgment to Defendants.

5.      *Monell* Claim

We also reverse the grant of summary judgment to Defendants on Plaintiffs' claim against Hillview. As with their § 1983 claims against Caple and Straughn, Plaintiffs did not articulate a clear theory for their *Monell* claim on summary judgment, and the opposition to Defendants' motion does not point to specific facts in the record to support their claim.[6] The district court granted summary judgment to Defendants on the basis that "there is nothing in the record to indicate that Caple and Straughn were implementing or executing any unconstitutional policy, ordinance, regulation, decision, or custom of Hillview or its Ordinances." (R. 62, PID 1112.)

This is correct; however, a plaintiff need not show that an individual defendant was implementing an unconstitutional policy, ordinance, or custom to succeed on a *Monell* claim. To establish municipal liability under *Monell v. Department of Social Services*, a plaintiff has four ways to show that a municipality had a "policy or custom" that caused the violation of his rights. The plaintiff can prove: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). The district court seems to have judged Plaintiffs' claim against only the first theory of liability—

---

[6] Plaintiffs cited only Ky. Rev. Stat. § 65.2005 for the proposition that Hillview is required "to defend employees such as Caple and Barrow to the extent they have acted in the scope of their employment." (R. 55, PID 801.)

whether the individual Defendants were "implementing or executing [an] unconstitutional policy." (R. 62, PID 1112.) But the pleadings indicate that Plaintiffs alleged a *Monell* claim under the second theory—that Caple and Straughn were "endowed by Hillview with final authority to make [retaliatory disciplinary decisions]." (R. 6, PID 95.) We therefore vacate and remand to the district court for reconsideration of the *Monell* claim under the correct legal standard.

## IV.

For the reasons stated above, we AFFIRM the district court's grant of summary judgment to Defendants on the civil-conspiracy claim and the tortious-employment-reprisal claim; REVERSE with regard to Plaintiffs' claim of First Amendment retaliation; VACATE with regard to the *Monell* claim; and REMAND to the district court for further proceedings consistent with this opinion.